**UNITED STATES of America,**

v.

**Kevin Cortas TYSON, Defendant.**

**No. 1:04CR453.**

United States District Court,
E.D. Virginia,
Alexandria Division.

March 16, 2005.

G. David Hackney, United States Attorney's Office, Alexandria, VA, for Plaintiff.

Bruce A. Johnson, Jr., Bowie, MD, Robert Lee Jenkins, Jr., Bynum & Jenkins, PLLC, Silver Spring, MD, for Defendant.

## MEMORANDUM OPINION

ELLIS, District Judge.

Following a search of his residence on September 9, 2004, defendant Kevin Cortas Tyson was arrested and charged with one count of conspiracy to possess with the intent to distribute cocaine and crack cocaine, in violation of 21 U.S.C. § 841(a)(1), and two counts of possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c). By pretrial motion, defendant seeks to suppress the drugs and firearm recovered from his residence in the course of the search, as well as certain statements made to law enforcement agents following discovery of the contraband. An evidentiary hearing was held on March 4, 2005, at which the government presented the testimony of Agents Brian Christian and Robert Valentine from the Drug Enforcement Administration (DEA). At the conclusion of the evidentiary hearing, the matter was taken under advisement pending preparation of the transcript and further briefing by the parties. *See United States v. Tyson,* Criminal No. 1:04cr453 (E.D.Va. Mar. 4, 2005) (Order). The transcript has since been prepared, the parties have filed supplemental briefs and the matter is now ripe for disposition.

### I.[1]

The record reflects that on the morning of September 9, 2004, DEA Agents Brian Christian and Don Garrett, both assigned to Task Force 10 in Annandale, Virginia, were dispatched to 8732 Airybrink Lane in Columbia, Maryland, to perform a "knock and talk" with the owner of the residence—Kevin Cortas Tyson—in connection with an investigation into the alleged illegal narcotics activities of Jessie Scott, one of Tyson's co-defendants in this matter. The agents had reason to believe that Tyson was somehow involved in the illegal narcotics activities forming the basis of the investigation.

Agents Christian and Garrett arrived at Tyson's residence, together with at least two additional agents, at approximately 9:00 a.m. that morning. Upon their arrival, Agents Christian and Garrett approached and knocked on the front door of the residence, while the additional agents remained in the front yard. At the time, Agents Christian and Garrett were both armed, with their weapons holstered. After a few minutes had passed, an individual, subsequently identified as Tyson, inquired from inside the residence who had knocked on the door. Agent Garrett then informed Tyson, through the front door, that he and Agent Christian were police officers; he also asked Tyson if they could speak with him. Tyson opened the front door and, when he did so, Agents Garrett and Christian detected a strong odor of marijuana emanating from the residence. Thus, Agent Garrett asked Tyson if he had been smoking marijuana. Tyson initially hesitated in responding to the question. Given Tyson's hesitance, Agent Garrett advised Tyson that the agents were conducting a narcotics investigation and were not concerned with "a little bit of marijuana." Agent Garrett also asked Tyson for permission to enter the residence to speak with him. At that point, Tyson admitted that he had just smoked a quantity of marijuana;[2] he also allowed Agents Garrett and Christian to enter his residence.

Once inside the residence, Agent Garrett reiterated to Tyson that law enforcement

---

1. The facts recited here are the Court's findings pursuant to Rule 12, Fed.R.Crim.P.

2. The record reflects that Tyson was alert and responsive to the agents' inquiries that morning and did not appear to the agents to be under the influence of any narcotics.

was conducting a drug investigation and asked Tyson if he would be willing to consent to a search of his residence. Tyson orally agreed to such a search. Accordingly, Agent Garrett left to retrieve a written "consent to search" form. Yet, when Agent Garrett returned and explained the consent form to Tyson and presented it to him for his signature, Tyson changed his mind, stating words to the effect of "Nah, I don't want you to search. I would rather you get a search warrant." Agent Garrett then asked Tyson if there were any other individuals present in the residence. Tyson responded that his young daughter—who later appeared to the agents to be less than two years old—was in an upstairs bedroom.

At this point in the conversation, Agent Christian walked back toward the front door to speak with the other agents waiting outside. While he was doing so, Tyson informed Agent Garrett that a firearm was present in the residence. This happened within ten to fifteen minutes of the agents' arrival at the residence. Agent Christian then overheard Agent Garrett advise Tyson that he was not under arrest, but that he was going to be placed in handcuffs for his own safety and for the safety of the agents. Agent Garrett restrained Tyson's hands behind his back, informing Agent Christian that Tyson had "stated that he [Tyson] had a weapon in the house."

Given the apparent presence of a firearm in the residence, the agents who had been waiting outside were asked to come inside to perform a protective sweep. A total of three or four agents conducted the sweep, with Task Force Officers E.J. Kelly and Bill Hien checking the upper level of the two-level residence for additional individuals and Agent Christian checking the ground level.[3] Agent Garrett remained with Tyson in the living room during the course of the protective sweep. Significantly, the agents' protective sweep of the residence was limited to closets, bathrooms, shower stalls and other areas where an individual might hide; no drawers, bags or small compartments were searched at this time. Moreover, the agents did not attempt to locate the firearm in the course of the protective sweep, because, as Agent Christian testified, if the agents "were sure that the residence was clear, the gun can't shoot anybody when there is nobody around. So we just made sure that the house was secure, and we left it as it is." The entire protective sweep lasted one to two minutes, with no additional individuals being located inside the residence.

At approximately 9:15 a.m., DEA Agent Robert Valentine—one of the case agents assigned to the instant narcotics investigation—arrived at the scene. Upon his arrival, Agent Garrett left the residence and walked out to the front yard to speak with Agent Valentine.[4] There, on the front lawn, Agent Garrett advised Agent Valentine that Tyson had not consented to a search of the residence and that a search warrant would need to be obtained; Agent Garrett also alerted Agent Valentine that a firearm was present in the residence.[5]

3. Although Agent Christian could not recall whether an additional Task Force Officer, Brian Gavin, was involved in the protective sweep, this fact is not material to disposition of the instant motion.

4. Meanwhile, Agent Christian stood at the front door of the residence, while Tyson remained in the living room.

5. Around this time, Agent Valentine telephoned Assistant U.S. Attorney David Hackney, the federal prosecutor assigned to the case, to advise him of the situation. Although Agent Valentine could not recall whether he placed this telephone call while outside on the front lawn or while inside the residence, the precise time of the call, and indeed the fact of

Following this oral briefing, Agent Valentine informed the other agents standing outside that he wished to go inside the residence to speak with Tyson. Agent Christian overheard Agent Valentine's comment in this regard and therefore walked from where he was standing in the front door area of the residence to join Agents Hien and Gavin in the front yard, while Agent Valentine entered the residence.

Upon entering the residence, Agent Valentine observed Tyson standing in the living room area, adjacent to the front entrance foyer. Tyson appeared nervous and was in restraints, with his hands still cuffed behind his back. According to Agent Valentine, Tyson—who had by then become a suspect in the investigation—was not free to leave the residence at that time. As Agent Valentine approached Tyson, he overheard some of the other agents present on the ground level inquiring about the location of the firearm. Agent Valentine then turned to Tyson and stated, "There's a gun in the house?"[6] Tyson promptly responded that there was, after which Agent Valentine asked Tyson if he would mind if the agents "looked for the gun, searched for the gun." Tyson orally consented to such a search, stating, "no, go ahead," and informed Agent Valentine that the gun was located in an upstairs bedroom. Following Tyson's oral consent, Agent Valentine instructed the other agents then present inside the residence to "go ahead and search for the gun." Several agents then proceeded upstairs to search for the firearm, although Agent Valentine could not verify precisely where the agents went upstairs or what, if anything, they found at that time.

While the agents were upstairs searching for the firearm, Agent Valentine advised Tyson that he wished to speak with him for a few minutes in the living room. Agent Valentine removed the restraints from Tyson's hands and the two men proceeded to the living room sofa. After they were seated, Tyson asked Agent Valentine if he could remain handcuffed, as he "would feel more comfortable" in restraints. Although Agent Valentine explained to Tyson that the restraints were not necessary, he complied with Tyson's request and reapplied the handcuffs, this time restraining his hands in front of his body.

While seated on the couch, Agent Valentine began advising Tyson as to the general nature of the then-ongoing narcotics investigation. Shortly after sitting down, Tyson orally consented to a search of his entire residence. Following this oral consent, Agent Valentine immediately presented Tyson with a written document, entitled "Consent to Search." This document contained three simple statements, namely (i) "I have been asked to permit Special Agents of the Drug Enforcement Administration to Search:...8732 Airybrink Ln., Columbia Md," (ii) "I have not been threatened, nor forced in any way," and (iii) "I freely consent to this search." Agent Valentine read the entire written document to Tyson, who indicated that he understood the document and had no questions as to its meaning or form. Tyson then signed the "Consent to Search" form in Agent Valentine's presence, as did Agent Valentine and an additional agent who was serving as a witness. At the time Tyson consented to the search, neither Agent Valentine nor any of the other

---

the call itself, is not material to disposition of the instant motion.

6. Agent Valentine's weapon was holstered in the waistline of his pants, likely visible, as he was not wearing a jacket.

agents present at the residence had advised Tyson of his *Miranda* rights.

After obtaining Tyson's written consent, Agent Valentine walked from the living room to the front door of the residence to advise the agents waiting outside that Tyson had authorized a search of the residence.[7] Several agents, including Agent Christian, then entered the residence and split up to conduct the search. Significantly, in the course of his testimony, Agent Christian confirmed that he began searching the residence only after being advised by Agent Valentine that Tyson had consented to the search in writing.

In the course of the search conducted pursuant to Tyson's written consent, Agent Christian proceeded first to a spare bedroom located next to the master bedroom on the upper-level of the residence. There, in a zipped blue duffel bag located in the back right-hand corner of the closet, Agent Christian discovered a .44 magnum revolver. He also discovered a quantity of crack cocaine in a designer handbag situated underneath some clothes on the closet floor, as well as some loose cash on a closet shelf.

While the agents were searching the residence, Agent Valentine remained seated with Tyson on the living room sofa. During this period, Agent Valentine was advised by other agents that the firearm and a quantity of crack cocaine had been located in the residence. Also during the search, Agent Valentine explained certain details of the narcotics investigation to Tyson, without asking him any questions. Specifically, Agent Valentine advised Tyson, *inter alia,* (i) that Scott was a subject of the investigation, (ii) that law enforcement had obtained information from Scott in the course of the investigation concerning Tyson's alleged involvement in narcotics activity, (iii) that individuals involved in the investigation could be exposed to prison time, and (iv) that he (Agent Valentine) would be willing to listen if Tyson wished to discuss his involvement in the investigation.

After the search of the upstairs level had been completed and the rooms cleared, Agent Valentine took Tyson into an upstairs bedroom while agents continued to search the remaining areas of the residence. Agent Valentine accompanied Tyson upstairs, in part, for privacy reasons, as Tyson had indicated his willingness to make a statement. At this time, Tyson's hands were still restrained in the front, at his own request, and at least one other agent was present in the room. Once upstairs, Agent Valentine again advised Tyson, *inter alia,* that the firearm, as well as a quantity of crack cocaine, had been discovered in the residence. Then, before Tyson made any statements, Agent Valentine orally advised Tyson of his *Miranda* rights and produced a document entitled "Statement of Rights and Waiver." Agent Valentine read the document in its entirety to Tyson and Tyson read the document himself. Tyson indicated that he understood the document and that he did not have any questions as to its meaning or form. Shortly thereafter, at 9:55 a.m., Tyson signed the "Statement of Rights and Waiver," as did Agent Valentine and a nearby agent serving as a witness.[8] The

---

7. According to Agent Valentine, approximately five minutes elapsed from the moment he first entered the residence to the moment he advised the other agents that Tyson had signed the written consent form.

8. At some point after Tyson consented to the search of his residence, but before he signed the written waiver of his *Miranda* rights, Agent Valentine had engaged in a discussion with Tyson about the safety of his daughter, who had been found by agents on the staircase of the residence. In this regard, Tyson

document provided, in pertinent part, (i) that Tyson had been taken into custody at 9:30 a.m., (ii) that he understood his rights and had agreed to waive those rights, (iii) that he did not want a lawyer, (iv) that no promises or threats or pressure of any kind had been used against him, and (v) that he was "willing to answer questions and make a statement" to law enforcement officers.

Only after Tyson had waived his *Miranda* rights did Agent Valentine engage in a typical "question and answer" verbal exchange with Tyson. During this exchange, Tyson made statements regarding the firearm and drugs that had been found in his residence, as well as his prior dealings with Scott, including the fact that he (Tyson) had purchased small amounts of cocaine from Scott on several occasions. Tyson also admitted to Agent Valentine that he had twice loaned his vehicle to Scott, and that he had loaned his firearm to Scott on one occasion in May 2004. During the course of this discussion in the upstairs bedroom, Agent Valentine recorded some of Tyson's statements in writing, reviewing each statement with Tyson as it was being documented to verify its accuracy. Then, after Tyson had completed his statement, Agent Valentine read the hand-written record of the statement to Tyson and asked Tyson to make any corrections or additions that he deemed appropriate. Tyson made two corrections to the written statement, initialing both, and signed the document at the bottom of the page, verifying that the statement was made "freely, without threats, promises or coercion." Agent Valentine also signed the written

statement, as did Agent Trent Nelson, as a witness.

In all, approximately one hour and ten minutes elapsed from the time Agent Christian and Agent Garret knocked on the front door of Tyson's residence to the time they left the scene. Agent Valentine, in turn, was at the residence for approximately one hour. The record reflects the presence of approximately six or seven agents during the course of the incident, namely Agents Christian, Garrett, Valentine, Hien, Gavin, Nelson, and possibly Kelly. At no time during the entire incident did any of these agents raise their voice to Tyson, coerce him in any way, make any promises to him, or threaten him with any violence. Nor did any of the agents draw or brandish their weapons at any time during the incident.

As a result of the search that morning, the agents ultimately took possession of the firearm and drugs found in Tyson's residence.[9] Based in part on this seized evidence, as well as the statements made by Tyson following discovery of the contraband, Tyson was arrested and charged in the instant prosecution with one count of conspiracy to possess with the intent to distribute cocaine and crack cocaine, in violation of 21 U.S.C. § 841(a)(1), and two counts of possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c). Tyson now moves to suppress the physical evidence seized from his residence on September 9, 2004, as well as the statements made to law enforcement agents on that occasion, on the following grounds: (i) that his consent to search was not voluntary, (ii) that his consent to search was given in violation

---

apparently authorized the agents to remove the child from the residence and deliver her to her mother, who had arrived at the residence some time that morning and was waiting outside.

9. It appears from the record that the agents did not provide Tyson with a property receipt or require him to sign any documents acknowledging the seizure of his property on that occasion, although they sometimes do so.

of his *Miranda* rights, (iii) that the search of his home exceeded the scope of his consent, and (iv) that he did not voluntarily waive his *Miranda* rights before giving his statement to the law enforcement agents. In response, the government argues (i) that Tyson consented voluntarily to the search of his house, (ii) that failure to advise a defendant of his *Miranda* [10] rights does not require suppression of the physical fruits of the defendant's voluntary statements, (iii) that even if the search exceeded the bounds of Tyson's consent to search for the handgun, the evidence is admissible under the "inevitable discovery" exception to the warrant requirement, and (iv) that Tyson voluntarily waived his *Miranda* rights before giving his statement.

## II.

### A. Suppression of Physical Evidence

■■■ It is well-established that, unless an exception applies, the Fourth Amendment requires law enforcement officials to obtain a warrant before they conduct a search. *See United States v. Boone*, 245 F.3d 352, 361 (4th Cir.2001) (citing U.S. Const. amend. IV). Likewise, it is also well-settled that voluntary consent to a search is one such an exception. *See, e.g., Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) ("One of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent."). When voluntary consent is given, it may be limited or withdrawn; thus, a warrantless search must not exceed the scope of the voluntary consent. *See United States v. McFarley*, 991 F.2d 1188, 1191 (4th Cir. 1993) (noting that a search may not exceed the scope of consent).

■■■ In determining whether a defendant's consent was voluntary, the critical inquiry is whether a defendant's consent to search was his own "essentially free and unconstrained choice" or whether his will was "overborne and his capacity for self-determination critically impaired." *United States v. Watson*, 423 U.S. 411, 424, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976) (quoting *Schneckloth*, 412 U.S. at 219, 93 S.Ct. 2041). This inquiry is based on an examination of the totality of the circumstances. *See Schneckloth*, 412 U.S. at 223–34, 93 S.Ct. 2041; *Boone*, 245 F.3d at 361; *United States v. Lattimore*, 87 F.3d 647, 650 (4th Cir.1996). In assessing the totality of the circumstances, appropriate factors to consider include the characteristics of the accused (such as his age, maturity, education, intelligence, and experience) and the conditions under which the consent to search was given (such as the officer's conduct, the number of officers present, and the duration of the encounter). *Lattimore*, 87 F.3d at 650. While it is a relevant factor in the voluntariness inquiry that the defendant knew of his right to refuse consent, the government need not establish that the defendant knew of his right to refuse to prove that consent was voluntary. *Boone*, 245 F.3d at 362; *United States v. Brugal*, 209 F.3d 353, 362 (4th Cir.2000). Additionally, consent given while in custody may still be voluntary so long as the totality of the circumstances confirms that the consent was not coerced. *Boone*, 245 F.3d at 362–63 (citing *Watson*, 423 U.S. at 424, 96 S.Ct. 820).

■■■ These principles, applied here, make clear that suppression of the physical evidence discovered in Tyson's upstairs bedroom is not required. Importantly, Agent Christian discovered the evidence Tyson seeks to suppress—the firearm and crack cocaine—only after Tyson signed the

---

**10.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

written consent to search his entire residence. And the record firmly supports the conclusion that this consent was given freely and voluntarily. This conclusion finds support in the fact that Tyson consented to the search not only verbally, but in writing. *See Boone*, 245 F.3d at 362 ("Written consent supports a finding that the consent was voluntary.") (citing *United States v. Navarro*, 90 F.3d 1245, 1257 (7th Cir.1996)). Further, the written consent form, signed by Tyson, stated that he "freely consent[ed]" to the search and that he was not "threatened, nor forced in any way." Moreover, it cannot be said that Tyson did not understand the implications of this consent; he was well aware of the purpose of the search as the agents had informed him that they were conducting a drug investigation. Also significant is that Tyson knew he could refuse consent as evidenced by his initial refusal to permit a search of his home without a warrant. *See Boone*, 245 F.3d at 363 (limitation of consent suggested that defendant knew he could refuse consent); *United States v. Elie*, 111 F.3d 1135, 1146 (4th Cir.1997) (revocation of consent demonstrated defendant knew of his right to refuse consent). While Tyson's knowledge of his right to refuse consent is not a prerequisite for a finding of voluntary consent, it is a relevant factor that favors a finding of voluntariness.[11] *Boone*, 245 F.3d at 362. Nothing in the record, whether age, maturity, education, intelligence, or experience, indicates that Tyson was incapable of making this decision voluntarily. While Tyson admitted that he had smoked a quantity of marijuana, he was alert and responsive to the agents' inquiries and did not appear to the agents to be under the influence of any narcotics. Moreover, no evidence was presented to the contrary or to suggest that

Tyson was mentally deficient or unable to exercise free choice.

Not only does the record firmly establish that Tyson's consent to search was given freely and voluntarily, there is also no evidence of duress or coercion. The record reflects that the agents did not raise their voices to Tyson, physically coerce him in any way, make any promises to him or threaten him with violence. While the officers carried firearms, the weapons remained holstered and were not drawn, brandished, or used to threaten Tyson during the incident. Nor was the duration of the incident unduly coercive—the record reflects that the entire encounter lasted little more than one hour and it appears that Tyson gave his written consent to search approximately thirty minutes after the officers arrived. While Tyson was arguably in custody at the time he consented to the search—Tyson was in handcuffs at the time and Agent Valentine conceded he was not free to leave—the "fact of custody alone has never been enough in itself to demonstrate a coerced confession or consent to search." *Watson*, 423 U.S. at 424, 96 S.Ct. 820; *see also Boone*, 245 F.3d at 363 & n. 9 (concluding consent was voluntary where defendant was handcuffed and reasonable person would not have felt free to leave). Indeed, the Fourth Circuit has suggested that the totality of the circumstances may still establish voluntary consent even if it is procured during an illegal detention. *See Boone*, 245 F.3d at 362–63 (concluding defendant's will was not overborne even if Terry stop exceeded permissible bounds). The relevant inquiry is not whether the defendant was in custody; rather, it is whether, considering the totality of the circumstances, defendant's consent was

---

11. When the decision first issued from the bench, it was stated in error that Tyson had previous experience with the law when, in fact, the record does not indicate any previous convictions for this defendant. The analysis here does not rely upon that factual error.

coerced.[12] And given the totality of the circumstances presented here, it follows that, even if Tyson was in custody, he still was free and able to exercise his will. Tyson gave his consent verbally and later in writing after Agent Valentine read the entire written form to Tyson who indicated that he understood the document and had no questions as to its meaning or form. Tyson did not ask the agents to leave or to discontinue the search, and after the conclusion of the protective sweep, he remained handcuffed at his own request. Thus, there is no support for the conclusion that Tyson's will was "overborne" or that his capacity for self-determination was "critically impaired." *Schneckloth,* 412 U.S. at 225, 93 S.Ct. 2041. Rather, the record reflects that Tyson's consent to search was the product of Tyson's voluntary, "essentially free and unconstrained choice," and so the physical fruits of that search are admissible into evidence. *Id.*

Tyson challenges this conclusion on two grounds: (i) that the search exceeded the scope of his consent and (ii) that at the time Tyson consented to the search, he was in police custody, but had not been read his *Miranda* rights. Both arguments fail.

First, Tyson argues that the quantity of crack cocaine must be suppressed because the discovery of this evidence *after* the discovery of the handgun exceeded the scope of his consent. Specifically, he argues that he gave verbal consent to Agent Valentine to search for the gun, but Agent Christian discovered the crack cocaine in a designer handbag covered from plain view only after discovering the handgun. Thus, Tyson concludes, the search of the handbag exceeded the scope of consent to search for the handgun. Yet, the record plainly reflects that Agent Christian, who discovered these items, began to search the entire residence only after Tyson had consented to the search in writing. So while the search of the handbag might arguably have exceeded the scope of more limited consent, it did not exceed the scope of written consent to search the entire premises of "8732 Airybrink Lane, Columbia Md." Thus, Tyson's first argument is without merit.[13]

Second, while Tyson complains that he was not given his *Miranda* rights before Agent Valentine asked him to consent to a

---

**12.** *See Boone,* 245 F.3d at 362–63; *see also United States v. Beason,* 220 F.3d 964, 966–67 (8th Cir.2000); *United States v. Guimond,* 116 F.3d 166, 170–71 (6th Cir.1997); *United States v. Thompson,* 106 F.3d 794, 798 (7th Cir.1997).

**13.** Because it is clear that the physical evidence Tyson seeks to suppress was discovered pursuant to his voluntary, written consent, it is unnecessary to address the government's alternative argument that, even if the crack cocaine was discovered before Tyson gave his written consent to search the entire residence, the "inevitable discovery" exception applies to permit its admission because the cocaine inevitably would have been found pursuant to that written consent. *See Nix v. Williams,* 467 U.S. 431, 444, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984) ("If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means ... then ... the deterrence rationale has so little basis that the evidence should be received."). In any event, it is correct that the agents inevitably would have discovered the cocaine pursuant to that written consent. Nor is there any evidence that, at the time Tyson signed the written consent form, his consent was tainted by reason to believe the agents had already located contraband pursuant to an illegal or unconsented search. *See United States v. Thomas,* 955 F.2d 207, 211 (4th Cir.1992) (holding that where defendant has reason to believe government agents have already found contraband pursuant to an illegal search there is a strong possibility that later consent is the fruit of the original search).

search of his residence, the most logical objection to raise here is not that Agent Valentine failed to read Tyson his *Miranda* rights, but that he failed to inform Tyson of his right to refuse consent to search his home. As the Supreme Court recently made clear, the *Miranda* rule is a prophylactic designed to protect against violations of the *Fifth Amendment* Self–Incrimination Clause, not the Fourth Amendment. *See United States v. Patane,* —— U.S. ——, ——, 124 S.Ct. 2620, 2626, 159 L.Ed.2d 667 (2004) (plurality opinion). Thus, while Tyson objects that he was not read his *Miranda* rights before he consented to the search of his home, it appears that he may be raising one of two objections:

(i) that the search violated his Fourth Amendment right to be free of unreasonable searches and seizures because the failure to warn him of his right to refuse consent to search indicates his consent was not voluntary; or

(ii) that admission into evidence of the physical fruits of the search would constitute a violation of his Fifth Amendment right under the Self–Incrimination Clause because the evidence is the physical fruit of his un-*Mirandized* consent.

Neither argument is ultimately successful and each is addressed in turn.

■ Tyson's first argument fails because the Supreme Court has made clear that there is no Fourth Amendment equivalent to the *Miranda* rule. As it held in *United States v. Drayton,* 536 U.S. 194, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002), the Fourth Amendment does not require police officers to advise persons of their right not to cooperate and to refuse consent to search. *Id.* at 206–07, 122 S.Ct. 2105. Nor does failure to notify a citizen of her right to refuse to cooperate establish a presumption of invalidity. *Id.* at 207, 122 S.Ct. 2105. Rather, "knowledge of the right to refuse consent is one factor to be taken into account [in the voluntariness inquiry;] the government need not establish such knowledge as the *sine qua non* of an effective consent." *Id.* at 206–07, 122 S.Ct. 2105. Thus, it is the voluntariness of the consent to search that controls and this determination is based on the totality of the circumstances, without giving decisive weight to the absence of this type of warning. *Id.* As already discussed, although Agent Valentine did not explicitly warn Tyson of his right to refuse consent to search, the totality of the circumstances make clear that Tyson's consent to search was voluntary. Most relevant here, although Tyson was not specifically warned, it is clear that he was aware of his right to refuse consent, as indicated by his initial refusal to permit a search of his residence without a warrant. Thus, despite the failure to warn Tyson of his right to refuse consent, the search of Tyson's residence did not constitute a violation of his Fourth Amendment right, and, therefore, does not require suppression of the physical fruits of the resulting search.

■ Nor does Tyson's Fifth Amendment right against self-incrimination require the suppression of the physical evidence uncovered during the search, despite the failure to warn Tyson of his right to remain silent. This is so for two reasons. First, the failure to warn Tyson of his right to remain silent did not violate the *Miranda* rule because Tyson was not required to be warned of his *Miranda* rights at the time he gave his consent to search. To satisfy the requirements of the *Miranda* rule, a suspect must be warned of his rights before police officers engage in "custodial interrogation." *Rhode Island v. Innis,* 446 U.S. 291, 297, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). In this case, it may be assumed without deciding that Tyson was in custo-

dy. *See Boone*, 245 F.3d 352, 363 n. 2 (4th Cir.2001) ("We will assume [the accused] was seized for purposes of the stop because he was handcuffed during the detention until the bomb-sniffing dog arrived, and a reasonable person in that situation would not feel free to leave or terminate the encounter"). Yet, it is clear that the request to search Tyson's home did not constitute "interrogation." As the Supreme Court has defined it, interrogation refers to express questioning or its "functional equivalent," which includes "any words or actions on the part of the police ... that the police should know are reasonably likely to elicit an incriminating response ...." *Id.* at 600–01. A request for consent to search a suspect's home does not qualify as interrogation. While it could be argued that police officers who ask for consent to search might reasonably expect that a search will ultimately *lead* to incriminating evidence, consent itself is not "an incriminating response" and so a request for consent to search does not constitute interrogation. *See United States v. Brown*, 1998 U.S.App. LEXIS 22311, at

*11 (4th Cir.1998) (unpublished disposition) (finding that police questioning did not constitute "interrogation" because defendant would not have considered himself under interrogation when he identified the location of his car key in the course of giving consent to search his car). Therefore, even if Tyson might have withheld consent had he been reminded of his right to remain silent, Tyson was not entitled to be warned of this right when asked if he would consent to a search of his residence.[14]

 Yet, even assuming, *arguendo*, that the request to search Tyson's home did constitute "custodial interrogation," it is clear that the admission of the physical fruits of this search, so long as Tyson's consent was voluntary, does not violate the Self–Incrimination Clause. As the Supreme Court made clear in *Patane*, the failure to give a suspect *Miranda* warnings does not require suppression of the physical fruits of the suspect's unwarned, but voluntary statements. *Id.* at 2626. The *Patane* plurality reasoned that the *Miranda* rule is a prophylactic designed to protect against violations of the Self–In-

**14.** It appears that Tyson invokes *Miranda* only to challenge the validity of his consent to search. Yet, to the extent that he seeks to suppress his earlier statements regarding the presence or the location of his handgun as violations of his *Miranda* rights or to the extent that he argues that these statements tainted his later consent to search, his argument fails. To begin with, Tyson's first disclosure of the presence of a gun clearly occurred before he was taken into custody. It is unclear whether subsequent statements were made after he was taken into custody and whether these statements were unprompted or in response to direct questioning. Yet, even assuming, *arguendo*, that Tyson's statements were made in response to "custodial interrogation," the agents' questions fell within the "public safety exception" to the *Miranda* rule. *See New York v. Quarles*, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984). The public safety exception applies when

"there is an objectively reasonable need to protect the police or the public from any immediate danger associated with [a] weapon." *United States v. Mobley*, 40 F.3d 688, 693 (4th Cir.1994) (quoting *Quarles*, 467 U.S. at 659 n. 8, 104 S.Ct. 2626). And, although Tyson was in handcuffs and a protective sweep had confirmed that only Tyson's daughter was present in the house, there was still an objectively reasonable need to protect the agents, and indeed Tyson's daughter, by securing the location of the firearm. Tyson, though handcuffed in front of his body, could have attempted to recover a firearm from a nearby undisclosed location or his daughter could have found the firearm left carelessly within reach. Thus, any questions regarding the presence or location of the firearm did not violate Tyson's *Miranda* rights nor did his answers taint his later consent to search his home.

crimination Clause, and the "core protection afforded by the Self–Incrimination Clause is a prohibition on compelling a criminal defendant to testify against himself." *Id.* Thus, while the admission of "unwarned statements into evidence at trial" constitutes a violation of the Self–Incrimination Clause, the introduction of physical evidence obtained as a result of voluntary statements does not. *See id.* Accordingly, even if the failure to warn Tyson of his right to remain silent before he consented to the search of his home constituted a violation of the *Miranda* rule, the fruits of that search are still admissible against him. For these reasons, the motion to suppress the physical evidence found in Tyson's residence must be denied.

## B. Suppression of Statements

It is also clear that suppression of Tyson's statements made to law enforcement agents after waiver of his *Miranda* rights is not required. Tyson concedes that he was warned of his *Miranda* rights prior to giving his statement but argues that his waiver of these rights was not voluntary because, prior to giving this statement, agents confronted Tyson with the details of the investigation and the evidence connecting him to various criminal narcotics transactions. Similar to a voluntary consent to search, the voluntariness of a statement given during custodial interrogation is to be determined from the "totality of the circumstances," including the characteristics of the defendant, the setting of the interview, and the details of the interrogation. *See United States v. Pelton,* 835 F.2d 1067, 1071 (4th Cir.1987). Likewise, the test of voluntariness is "whether the defendant's will has been 'overborne' or his 'capacity for self-determination critically impaired.'" *Id.* (quoting *Schneckloth,* 412 U.S. at 225, 93 S.Ct. 2041). Significantly, however, "[v]oluntari-

ness is not . . . 'to be equated with the absolute absence of intimidation,' for under this test virtually no statement would be voluntary." *Id.* (citing *United States v. Wertz,* 625 F.2d 1128, 1134 (4th Cir.1980)).

The same facts that support the conclusion that Tyson voluntarily consented to a search of his home also support the conclusion that his statement to the law enforcement agents and waiver of his *Miranda* rights were executed voluntarily. While Tyson had smoked a quantity of marijuana, the record reflects that he did not appear to be impaired or under the influence of those narcotics when he made his decision. Tyson signed the "Statement of Rights and Waiver" after reading the form to himself and after Agent Valentine read the form out loud and confirmed that Tyson had no questions about its meaning or form. By signing the written form, Tyson represented that he understood his rights, that he agreed to waive those rights, that he did not want a lawyer, and that no promises or pressure of any kind had been used against him. There is no evidence to contradict these representations nor is there any evidence to support a conclusion of duress or coercion. Before Tyson made his statement, the officers removed Tyson to a separate room where only two agents were present. Although Agent Valentine informed him of the evidence found in Tyson's home, the nature of the evidence linking him to the drug conspiracy, and that individuals involved in the investigation could be exposed to prison time, these true statements, though perhaps intimidating, cannot be said to be unduly coercive. As the Fourth Circuit has made clear, " 'truthful statements about [the defendant's predicament] are not the type of 'coercion' that threatens to render a statement involuntary." *United States v. Elie,* 111 F.3d 1135, 1141–43 (4th Cir.1997) (quoting *Pelton,* 835 F.2d at 1072); *Brown,*

1998 U.S.App. LEXIS 22311, at *11–12. Thus, the record reflects that Tyson's waiver of his *Miranda* rights and his statement given to the agents were executed freely and voluntarily. Accordingly, it is not required that Tyson's statements made after the waiver of his *Miranda* rights be suppressed.

An appropriate Order has issued.