**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**November 6, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

MANUEL DE JESUS CRUZ-
MENDEZ, also known as Manuel
Bosquez-Murrieta, also known as
Jesus Romero,

Defendant - Appellant.

No. 05-4296

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**
**(D.C. NO. 2:05-CR-41-TS)**

---

Theodore R. Weckel, Salt Lake City, Utah, for Defendant - Appellant.

Karen M. Fojtik, Assistant United States Attorney (Brett Tollman, United States
Attorney, with her on the brief), Salt Lake City, Utah, for Plaintiff - Appellee.

---

Before **HARTZ**, **EBEL**, and **McCONNELL**, Circuit Judges.

---

**HARTZ**, Circuit Judge.

---

Manuel de Jesus Cruz-Mendez was convicted in the United States District

Court for the District of Utah on a charge of illegal reentry into the United States

after a bench trial on stipulated evidence. *See* 8 U.S.C. § 1326. On appeal he challenges the district court's denial of his motion to suppress evidence because of alleged violations of the Fourth Amendment. We have jurisdiction under 28 U.S.C. § 1291 and affirm the conviction and sentence. We hold that (1) the law-enforcement officers' "knock and talk" was not a Fourth Amendment intrusion; (2) the district court did not clearly err in finding that Mr. Cruz-Mendez's girlfriend, Olga Armenta, consented to the officers' entrance into the living room of her apartment; (3) the cellular phone observed by the officers in the apartment living room was in plain view; (4) the district court did not clearly err in finding that Ms. Armenta consented to a search of the bedroom; and (5) the officers had probable cause to arrest Mr. Cruz-Mendez. Because we conclude that there were no Fourth Amendment violations, we need not address whether a violation would require that Mr. Cruz-Mendez's identity be suppressed.

## I. BACKGROUND

We summarize the evidence offered at the suppression hearing in the light most favorable to the district court's decision. *See United States v. Hunnicutt*, 135 F.3d 1345, 1348 (10th Cir. 1998). On December 17, 2004, Department of Homeland Security (DHS) Agent Leslie Derewonko received a phone call from a female concerning a man named Manuel Cruz-Mendez. The caller said that he had previously been deported, he had several previous narcotics convictions, and

her husband had seen him at a particular address in Provo that morning. That address turned out to be an apartment rented by Mr. Cruz-Mendez's girlfriend, Ms. Olga Armenta.

Agent Derewonko asked fellow DHS Security Agent Carlos Gamarra to meet him at the apartment, and also contacted the Provo Police Department so that he and Agent Gamarra, who were in civilian clothes, could have uniformed officers with them.

At 8:00 a.m. Agents Derewonko and Gamarra, along with Officer Brian Moore of the Provo Police Department, went to the apartment. Ms. Armenta's brother answered their knock on the door. He was putting on his coat and about to leave. The officers introduced themselves but did not enter the apartment. When Agent Derewonko asked the brother for identification, he produced a green card. Ms. Armenta, who gave her name as Olga, was sitting in the room behind her brother; she was dressed in pajamas. One of the officers asked Ms. Armenta and her brother whether they knew a Manuel Cruz-Mendez. Both responded that they did not know him and that there was no one else in the apartment.

After this brief exchange the officers left the apartment and returned to the parking lot. Officer Moore spoke with Provo Police Officer Brad MacFarlane, who said that a few days earlier he had received a call from an anonymous female who had provided the same information received by Agent Derewonko. The

caller had further stated that Mr. Cruz-Mendez was staying with his girlfriend, Olga. Officer MacFarlane also told Officer Moore that he understood that there was a Salt Lake City arrest warrant on a narcotics charge for a Mr. Manuel Cruz.

The officers saw Ms. Armenta's brother leave the apartment shortly after they received this information. The officers, now accompanied by Officer MacFarlane, returned to the apartment at 8:20 a.m. and knocked again. Ms. Armenta answered the door. Agent Derewonko told Ms. Armenta that the officers had received information that she and Mr. Cruz-Mendez's girlfriend had the same name. She again said that there was no one else in the apartment. Agent Derewonko then asked Ms. Armenta if the officers could step into the apartment because of the cold weather, and she invited them in.

Once inside, Agent Derewonko asked Ms. Armenta for identification to confirm her name. She stated that it was in her car and left the apartment to get it. As she retrieved it, the officers waited outside her apartment. They did not enter again until she returned with a Utah driver's license, when she again let them in.

At 8:35 a.m. one of the Provo police officers ran a check on Ms. Armenta's license; it was valid. Agent Derewonko then asked if he could look into the bathroom for the safety of the officers. Ms. Armenta consented, so Agent Derewonko, with Ms. Armenta following him, inspected the bathroom. When the

pair returned to the living room, she found the other officers looking at pictures in the living room. Ms. Armenta expressed her displeasure that they were looking around the living room and at the pictures, but she did not ask them to leave.

Agent Derewonko then asked Ms. Armenta what her immigration status was. When she said that she was a legal resident, he requested documentation. She went to her bedroom to get proof, but refused to allow Agent Derewonko to come with her. When she returned with her green card, he made a telephone call to verify its immigration number. Agent Derewonko then asked if he could search the apartment, and she refused. Agents Derewonko and Gamarra repeated this request one or two more times, but she continued to refuse. She said that they could search only if they had a warrant. Agent Gamarra explained the procedure for obtaining a warrant (including preparation of an affidavit for review by the United States Attorney and then submission to a judge for approval) and that she could be arrested for harboring if Mr. Cruz-Mendez were found in the apartment. (The district court's narrative of its findings says that "Agent Gamarra then told her that if the officers were not permitted to search the apartment, he would *obtain* a warrant." R. Doc. 48 at 7 (District Court Memorandum Decision and Order of July 1, 2005 (District Court Decision)) (emphasis added). But the testimony at the suppression hearing, including Ms. Armenta's testimony, indicates that the officers spoke only of *seeking* a warrant. In any event, the

conclusions we reach in this case do not turn on the distinction between a statement by the officers that they would *get* a warrant and a statement that they would *seek* a warrant.)  Ms. Armenta asked some questions about the warrant procedure and then said, "[F]ine, go get a search warrant."  R. Vol. II at 122.  Although she testified that the officers threatened that if they got a warrant they would break the doors and take everything out of the closet, they denied that they made such a threat, testifying that they had said only that they could look anywhere a person could hide.  The district court believed the officers.

The officers were about to leave to seek a warrant when Officer Moore noticed a black jacket on a love seat next to the officers.  To him this "seemed suspicious because a male had just left putting a coat on, but yet we've got another male's jacket laying [sic] as though they are preparing to leave or had just come in."  Id. at 186.  He then "shined his flashlight on the jacket and noticed a cell phone protruding from the pocket.  While he did not touch the jacket, he bent over, shined a flashlight on the phone, and inspected the phone."  R. Doc. 48 at 7 (District Court Decision).  The name "CRUZ" was etched (perhaps with a ballpoint pen) on the phone.  Officer Moore then drew Agent Gamarra's attention to the phone; Agent Gamarra was able to see the word "CRUZ" without the flashlight and without touching the jacket.

Noticing that the officers had seen the cellular phone, Ms. Armenta became upset. She directed Agent Gamarra outside, where she confirmed that Mr. Cruz-Mendez was in the bedroom closet. She told Agent Gamarra that he could search the bedroom, but she asked the officers to pretend to enter without her consent because she was afraid of Mr. Cruz-Mendez.

After securing the rest of the apartment, Agents Gamarra and Derewonko found Mr. Cruz-Mendez hiding under a pile of clothes in the bedroom closet. They arrested him and read the *Miranda* warnings. He gave his name as Manuel Cruz-Mendez. About 25 or 30 minutes had passed since the officers first entered the apartment; a Provo Police Department Call for Service report indicates that, in the words of Officer Moore, they were "completely done" by 9:00 a.m. R. Vol. II at 195. The officers later discovered that the arrest warrant from Salt Lake City was not for Mr. Cruz-Mendez but for a man named Manuel Camarillo Cruz.

Mr. Cruz-Mendez was charged with illegal reentry under 8 U.S.C. § 1326. He moved to suppress all evidence in the case, claiming violations of the Fourth Amendment. After conducting an evidentiary hearing, the district court issued a written decision and order holding that Mr. Cruz-Mendez had standing to contest the officers' search but denying his motion to suppress evidence.

Mr. Cruz-Mendez was found guilty on August 17, 2005, after a bench trial on stipulated evidence. He was sentenced to a term of 57 months in federal prison.

## II.  DISCUSSION

When reviewing a district court's denial of a motion to suppress, we consider the totality of the circumstances and view the evidence in the light most favorable to the government. *See Hunnicutt*, 135 F.3d at 1348. "We accept the district court's factual findings unless those findings are clearly erroneous." *United States v. Villa-Chaparro*, 115 F.3d 797, 801 (10th Cir. 1997).

### A.  "Knock and Talk"

Mr. Cruz-Mendez first contends that the officers lacked reasonable suspicion for the initial approach to the apartment to conduct a so-called "knock and talk" investigation. But reasonable suspicion was unnecessary. As commonly understood, a "knock and talk" is a consensual encounter and therefore does not contravene the Fourth Amendment, even absent reasonable suspicion. *See United States v. Spence*, 397 F.3d 1280, 1283 (10th Cir. 2005) ("There is no *per se* rule that a police encounter within an individual's home is a seizure within the meaning of the Fourth Amendment."); *United States v. Thomas*, 430 F.3d 274, 277 (6th Cir. 2005) ("A number of courts . . . have recognized 'knock and talk' consensual encounters as a legitimate investigative technique at the home of a

suspect or an individual with information about an investigation."); *United States v. Cormier*, 220 F.3d 1103, 1109 (9th Cir. 2000) ("[N]o suspicion needed to be shown in order to justify the 'knock and talk.'").

Mr. Cruz-Mendez's reliance on *United States v. Jones*, 239 F.3d 716, 720–21 (5th Cir. 2001), is misplaced. In *Jones* the issue was whether a police officer's plain view of a handgun inside an apartment during a "knock and talk" improperly created the exigent circumstances that justified a warrantless entry into the home. *Id.* at 719–20. Rather than questioning the propriety of a "knock and talk," the court observed that "[f]ederal courts have recognized the 'knock and talk' strategy as a reasonable investigative tool when officers seek to gain an occupant's consent to search *or* when officers reasonably suspect criminal activity." *Id.* at 720 (emphasis added). The court ultimately held the warrantless entry to be justified. *Id.* at 722.

In short, the officers in this case did not need reasonable suspicion before knocking on Ms. Armenta's door with the intent to ask her questions. Whether any of their later actions constituted an unlawful search or seizure is the subject of the remainder of our discussion.

**B.    Entry into Living Room**

Mr. Cruz-Mendez apparently contends that Ms. Armenta did not consent to the officers' presence in her living room during their second visit to the apartment. The district court held that she voluntarily consented.

Consent can justify an entry into a home, regardless of whether there is probable cause. *See United States v. Sawyer*, 441 F.3d 890, 894 (10th Cir. 2006). But consent is valid only if it is "freely and voluntarily given." *Id.* (internal quotation marks omitted). Whether consent satisfies this requirement is "a factual determination based upon the totality of the circumstances." *Id.*

We uphold a district court's factual findings regarding consent "unless they are clearly erroneous." *Id.* "A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. De la Cruz-Tapia,* 162 F.3d 1275, 1277 (10th Cir. 1998) (internal quotation marks and brackets omitted). The clearly-erroneous standard is "significantly deferential." *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust*, 508 U.S. 602, 623 (1993). Our deference to the district court's factual findings is even greater when the credibility of witnesses is at issue. *See Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985) (interpreting Fed. R.

Civ. P. 52(a)); *United States v. Little*, 60 F.3d 708, 713 (10th Cir. 1995) (applying *Anderson* to appellate review of findings at suppression hearing).

The district court found that Ms. Armenta's consent to the officers' entering her apartment "was unequivocal and freely given with no duress." R. Doc. 48 at 11 (District Court Decision). The court observed that although Ms. Armenta was apparently not pleased that the officers had been looking around her living room while she and Agent Derewonko inspected the bathroom, she did not ask them to leave.

Mr. Cruz-Mendez claims that any consent was necessarily coerced by the presence of multiple officers and the officers' request for identification and, later, proof of legal status. The presence of several officers is, however, not dispositive. *See United States v. Ledesma*, 447 F.3d 1307, 1314 (10th Cir. 2006) (providing list of factors, none of which is dispositive). Nor does a mere request for identification render a consent involuntary. *Cf. United States v. Evans*, 937 F.2d 1534, 1537–38 (10th Cir. 1991) (request to see identification can be a non-coercive, consensual encounter not implicating the Fourth Amendment). The officers testified that they acted courteously and did not draw their weapons. She gave consent to enter soon after they came to her door the second time. *See United States v. Benally*, 146 F.3d 1232, 1239–40 (10th Cir. 1998) (length of interviews with defendant relevant in determining whether consent was coerced).

-11-

And she invited them in again after she retrieved her license. In addition, the court could properly view her state of mind in hindsight; one can now infer that her concern was that the officers not enter the bedroom, and that she was not reluctant for them to enter the rest of the apartment. The district court's finding of voluntariness was not clearly erroneous.

## C.     View of Cellular Phone

The district court ruled that the officers' view of the cellular phone etched with the name "CRUZ" was lawful because the phone was in plain view. Mr. Cruz-Mendez contends that this ruling was erroneous. We review de novo the district court's ruling. *See United States v. Thomas*, 372 F.3d 1173, 1178 (10th Cir. 2004).

The only issue here is whether the officers' *observation* of the cellular phone violated the Fourth Amendment. Mr. Cruz-Mendez would have us analyze the legality of this observation under the plain-view doctrine governing the seizure of items in plain view; he contends that the requirements of that doctrine were not satisfied. But, as the Supreme Court has stated, "It is important to distinguish 'plain view,' as used in *Coolidge* [*v. New Hampshire*, 403 U.S. 443 (1971)] to justify *seizure* of an object, from an officer's mere observation of an item left in plain view. . . . [T]he latter generally involves no Fourth Amendment search." *Texas v. Brown*, 460 U.S. 730, 738 n.4 (1983). For a mere observation

to be valid, the only requirement is that the officer be lawfully in a position from which he can view the object. *See id.* at 737, 740–41; *United States v. Gonzales-Acosta*, 989 F.2d 384, 387 (10th Cir. 1993). We have already concluded that Ms. Armenta voluntarily consented to the officers' presence in the living room. The officers were thus lawfully in a position from which they could view the cellular phone. *See Gonzales-Acosta*, 989 F.2d at 387.

Mr. Cruz-Mendez appears to contend that the use of a flashlight converted the observation into a Fourth Amendment search. We note, however, that the district court found that Agent Gamarra was able to read the word "CRUZ" without the aid of the flashlight. In any event, the "use of artificial means to illuminate a darkened area simply does not constitute a search, and thus triggers no Fourth Amendment protection." *Brown*, 460 U.S. at 740. The officers' observation of the cellular phone did not violate the Fourth Amendment.

**D.    Search of the Bedroom**

Mr. Cruz-Mendez claims that Ms. Armenta's consent for the officers to search the bedroom was coerced. The district court found that Ms. Armenta had verbally consented to the search of her bedroom and that her consent was made "unequivocally, specifically, freely, and intelligently," without coercion by the officers. R. Doc. 48 at 12 (District Court Decision). As we have already

discussed, we review only whether the factual findings regarding consent were clearly erroneous. *See Sawyer*, 441 F.3d at 894.

We cannot say that the district court's findings were clearly erroneous. Although Ms. Armenta testified that she never consented to a search of the apartment, Agent Gamarra testified to the contrary and the district court credited his testimony. We see no reason not to defer to the court's credibility determination.

As for coercion, Mr. Cruz-Mendez contends that the officers' questioning of Ms. Armenta without reasonable suspicion and the fact that Ms. Armenta is "presumptively uneducated," Aplt. Br. at 24, render her consent involuntary. There is no merit to these arguments. Because we have already held that Ms. Armenta consented to the officers' presence in the living room, the officers were not required to have reasonable suspicion for their questioning. And there is nothing in the record to indicate that Ms. Armenta was uneducated.

Mr. Cruz-Mendez also points, however, to several additional, more significant circumstances: the presence of several armed officers, the length of time the officers were in the apartment, and the officers' statement that they would get a search warrant if Ms. Armenta did not consent. His argument is hardly frivolous and could have persuaded a rational fact-finder that the consent was involuntary. But it does not require setting aside the district court's finding.

First, the district court explicitly found that the officers were not overly threatening or forceful. Second, although the officers' encounter with Ms. Armenta was more than momentary, the length did not necessarily make it overbearing. The district court found that the officers' second visit to Ms. Armenta's apartment lasted approximately 30 minutes before Mr. Cruz-Mendez was arrested. (The court's time frame is consistent with the Provo Police Department Call for Service report, which indicates that Ms. Armenta's license was verified at 8:35 a.m. and that the arrest was completed by 9:00 a.m.) During that period Ms. Armenta had left to retrieve her license from the car, Agent Derewonko had searched the bathroom, Ms. Armenta had retrieved her green card, she had her conversation with Agent Gamarra outside, and the officers secured the apartment, searched the bedroom closet, and arrested Mr. Cruz-Mendez. This was not the equivalent of a lengthy interrogation in a bare room while the subject sits on a stool until her will is overborne. *Cf. Benally*, 146 F.3d at 1240 (statement following one-and-a-half-hour interview after *Miranda* warning was not coerced); *United States v. Strache,* 202 F.3d 980, 986 (7th Cir. 2000) (defendant who was handcuffed for 20 minutes before consenting nonetheless did so voluntarily); *United States v. French*, 974 F.2d 687, 693 (6th Cir. 1992) (45 minutes between stop and consent did not amount to coercion); *United States v. Tyson*, 360 F. Supp. 2d 798, 806 (E.D. Va. 2005) (consent given

30 minutes after officers arrived; finding of voluntariness supported by initial refusal to permit warrantless search).

Most helpful to Mr. Cruz-Mendez is Agent Gamarra's assertion to Ms. Armenta that he would get a search warrant if she did not consent. But such statements are not per se coercive. *See United States v. Severe*, 29 F.3d 444, 446 (8th Cir. 1994) (officers' statement that they would obtain a search warrant "only one factor in the totality of the circumstances"); *United States v. White*, 979 F.2d 539, 542 (7th Cir. 1992) (although baseless threats to obtain a warrant may render consent involuntary, an expression of a genuine intent to obtain one does not); *United States v. Hummer*, 916 F.2d 186, 190 (4th Cir. 1990) ("The fact that a search warrant was mentioned does not necessarily constitute a coercive factor negating consent." (internal quotation marks omitted)); *United States v. Agosto*, 502 F.2d 612, 614 (9th Cir. 1974) (officer's statement that he would obtain a warrant if consent not given is "not conclusive as a matter of law"); *cf. United States v. Culp*, 472 F.2d 459, 462 (8th Cir. 1973) (defendant's consent valid even though it followed officer's statement that a search warrant was being procured, because defendant consented for an independent, voluntary reason). One must still examine the particulars of the case.

The district court had two weighty reasons for not finding that Agent Gamarra's assertion improperly overpowered Ms. Armenta's will. First, the

assertion did not in itself cause Ms. Armenta to consent. When told how the officers could procure a warrant, she said, "[F]ine, go get a search warrant." R. Vol. II at 122. She changed her mind only when the officers discovered the cellular phone with "CRUZ" etched on it. At that point she knew that the officers had caught her in a lie. The district court could have reasonably inferred that the psychological impact of this realization was more powerful than the officers' assertion that they would get a warrant. It stated that Ms. Armenta "readily consented" only after she realized that the phone had been discovered. R. Doc. 48 at 12 (District Court Decision). Second, even if Agent Gamarra's original assertion that they would get a warrant was improperly coercive because the officers clearly lacked the requisite probable cause, that assertion was likely true by the time the assertion bore any fruit (namely, Ms. Armenta's consent). When the officers found a man's coat in the apartment with a cellular phone labeled "CRUZ" in the pocket, after Ms. Armenta and her brother had denied knowing a Mr. Cruz-Mendez, they probably had sufficient additional information to procure a warrant. *See White*, 979 F.2d at 542 (expression of genuine intent to obtain warrant "does not vitiate consent").

We hold that the district court did not clearly err when it found that Ms. Armenta voluntarily consented to the search of the bedroom.

**E.     The Arrest**

Mr. Cruz-Mendez contends that the officers lacked probable cause to arrest him at the apartment. The district court concluded that the officers had probable cause. We review this determination de novo. *See United States v. Dozal*, 173 F.3d 787, 792 (10th Cir. 1999). As this court has previously stated:

> Probable cause to arrest exists only when the facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed. Probable cause does not require facts sufficient for a finding of guilt; however, it does require more than mere suspicion. Probable cause is measured against an objective standard. The primary concern is whether a reasonable officer would have believed that probable cause existed to arrest the defendant based on the information possessed by the arresting officer.

*United States v. Soto,* 375 F.3d 1219, 1222 (10th Cir. 2004) (internal citations, ellipsis, and quotation marks omitted).

We agree with the district court. The officers began with anonymous tips that a previously deported felon named Manuel Cruz-Mendez was at a particular address. Such tips are in themselves entitled to little weight. But the followup investigation provided substantial corroboration. First, the officers' identification of Olga Armenta corroborated one caller's tip that Mr. Cruz-Mendez was staying with his girlfriend Olga at the apartment. Second, the officers' discovery of a man's jacket containing a cellular phone etched with the name "CRUZ" corroborated the presence of Mr. Cruz-Mendez at this address, particularly since the discovery indicated that Ms. Armenta had lied when she had been asked

whether she knew a Mr. Cruz-Mendez. Third, Ms. Armenta's admission outside the apartment that she had been lying about Mr. Cruz-Mendez's presence, that she feared him, and that he was hiding served to corroborate the anonymous tips regarding his location and history and to indicate that he was living in the apartment and was avoiding law-enforcement authorities. Fourth, the discovery of Mr. Cruz-Mendez hiding under clothing in a closet further corroborated the two anonymous calls, and demonstrated his consciousness of guilt. *Cf. United States v. Fernandez*, 18 F.3d 874, 879 n.4 (10th Cir. 1994) ("It is well recognized that a defendant's intentional flight from police officers may be used as circumstantial evidence of guilt."). And fifth, at the time of the arrest the officers knew that there was a warrant issued out of Salt Lake City for a man named Manuel Cruz. *Cf. Hill v. California*, 401 U.S. 797, 802 (1971) ("When the police have probable cause to arrest one party, and when they reasonably mistake a second party for the first party, then the arrest of the second party is a valid arrest." (internal quotation marks and brackets omitted)). The totality of this information established probable cause to arrest Mr. Cruz-Mendez.

Finally, Mr. Cruz-Mendez, citing *Payton v. New York*, 445 U.S. 573 (1980), claims that "where as here, the police do not have an arrest warrant, they may not arrest a person in his home even with probable cause, absent exigent circumstances." Aplt. Br. at 26. But *Payton* holds only that "the Fourth

Amendment . . . prohibits the police from making a warrantless and *nonconsensual* entry into a suspect's home in order to make a routine felony arrest." 445 U.S. at 576 (emphasis added). Because we have held that the officers' entry into the bedroom was consensual, *Payton* does not apply.

## III.   CONCLUSION

The district court's findings support the conclusion that the officers' conduct did not violate the Fourth Amendment. We need not address the parties' arguments regarding whether such a violation would require suppression of Mr. Cruz-Mendez's identity. We AFFIRM the judgment below.