**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

KYMBERLI LAMBERT,

      Defendant - Appellant.

No. 08-4202
(D. Utah)
(D.C. No. 2:07-CR-00925-DAK-1 )

**ORDER AND JUDGMENT**[*]

Before **HENRY**, Chief Circuit Judge, **MURPHY**, and **O'BRIEN**, Circuit Judges.

Kymberli Lambert pled guilty to being a felon in possession of a firearm, preserving her right to appeal from the district court's denial of her motion to suppress. The court denied Lambert's motion because it concluded she voluntarily consented to the police officers' entry into her motel room and the subsequent search of her possessions, which led to the discovery of the firearm. On appeal, Lambert does not challenge the officers' entry into her motel room but contends her consent to search her possessions

---

[*] This order and judgment is an unpublished decision, not binding precedent. 10th Cir. R. 32.1(A). Citation to unpublished decisions is not prohibited. Fed. R. App. 32.1. It is appropriate as it relates to law of the case, issue preclusion and claim preclusion. Unpublished decisions may also be cited for their persuasive value. 10th Cir. R. 32.1(A). Citation to an order and judgment must be accompanied by an appropriate parenthetical notation – (unpublished). *Id.*

was invalid.  We affirm.

## I.     BACKGROUND

At approximately 10:30 p.m. on December 5, 2007, Salt Lake City Police Officers Devin Fredrickson Stutz and Neil Carson received a call from dispatch stating it had received a complaint that a woman at the Allstar Motel was trying to sell a laptop computer and a firearm.  Carson contacted the complainant and learned the seller's name was Shelby and she was fleeing from some kind of criminal charge.  Stutz called Shelby's cell phone number.  No one answered but Stutz listened to the voicemail greeting.

Stutz and Carson drove to the motel, arriving at approximately 11:00 p.m.  The front desk clerk informed them Shelby Remington was registered in Room 164.  Stutz and Carson knocked on the door of Room 164 at approximately 11:30 p.m.  The door was an exterior door, facing the parking lot.  The lights in the room were off.  It was "very cold outside."  (R. Supp. Vol. I at 17.)  The officers were wearing their uniforms and their firearms were holstered.

Lambert answered the door wearing only a bathrobe and identified herself as Shelby Remington.  The officers engaged in an "investigative type of conversation" with Lambert outside of her room.  (*Id.* at 18.)  The officers told Lambert about the information they received and asked her if she was in possession of a nine millimeter firearm.  She said she was not.  Neither officer raised his voice or touched Lambert.  The officers did not ask Lambert if they could enter her room.

After approximately ten to fifteen minutes of questioning, Lambert "asked [the

officers] to come inside because of the cold." (*Id.* at 19.) Stutz could not remember Lambert's exact words but testified: "I believe we were just standing there, and she said, it's cold. It's cold outside. Do you guys want to come in?" (*Id.* at 44.)

The officers entered the motel room, which contained two beds in the main area, a small back bedroom, a bathroom and a closet. Lambert sat on the bed closest to the door. Stutz testified the lights were on though it is not clear who turned them on; he testified it was "[p]robably" him or Carson. (*Id.* at 51.) The officers continued questioning Lambert. They asked her for her identification but she stated it had been stolen; they asked for her social security number but she said she had not memorized it. Stutz asked Lambert if she was fleeing from a criminal charge or a warrant and she denied that she was. The officers asked Lambert if she had a cell phone; she stated she did not.

Stutz thought it was strange Lambert had not reported her identification as stolen and had not memorized her social security number. He also thought her voice was the same one he had heard on the voicemail greeting when he called the phone number given by the complainant. The officers again asked Lambert whether she had a cell phone. She stated she did have a phone and had forgot she had it with her.

Lambert asked the officers if she could smoke a cigarette. They informed her she could not. Stutz noticed Lambert's "barely open" purse on the floor between the two beds in the main room. (*Id.*) He walked up to it and shined his flashlight into it. Lambert did not ask the officers to leave. Stutz testified she did not appear to be intimidated.

At this point, Lambert was still wearing only her bathrobe. Carson asked her to

- 3 -

get dressed because her lack of clothing "made [the officers] feel uncomfortable." (*Id.* at 23.) Carson looked in the bathroom "[t]o make sure there was no weapon" and then asked her to change in the bathroom. (*Id.* at 50.) Lambert began to change without closing the door. Stutz testified this made the officers feel uncomfortable so "[w]e asserted several times to her that she needed to close the door while she was changing, and eventually she heeded to our request and closed [the door] while she changed." (*Id.* at 24.)

The officers contacted their supervisor, Sergeant Randy Kent Bushman, because of their continuing discomfort and their belief Lambert was being untruthful. Before Bushman arrived, Lambert produced a birth certificate in the name of Shelby Remington with the date of birth Lambert had given as her own.

Bushman arrived at approximately 12:36 a.m., five to ten minutes after he was called. Bushman and Carson stayed in the room; Stutz went to his vehicle to see if he could verify Lambert's statement that she was from Pocatello, Idaho. He contacted the police department in Pocatello and learned there was no person with the name "Shelby Remington" in Idaho. He also contacted the individual identified as the owner of the vehicle parked outside Lambert's hotel room. That individual stated she had sold the vehicle to Shelby Remington.

Meanwhile, Bushman began questioning Lambert, informing her Stutz and Carson "didn't think she was telling the truth" and thought "maybe she had something to do with . . . selling the gun and the laptop on the street." (*Id.* at 68.) She denied having a gun or a laptop and said: "You can check." (*Id.* at 69.) Bushman did not ask for permission to

- 4 -

search.  He testified: "She suggested, I confirmed, told her she could show me around. She got off the bed and commenced in showing me." (*Id.*)

Lambert began showing Bushman around the room.  She opened "duffle bags and sacks and other luggage"; she "pulled a few items out just showing there was no way to conceal a laptop size piece of equipment." (*Id.* at 70-71.)  There was one bag remaining—a large black nylon suitcase sitting at the foot of one of the beds.  Lambert approached the bag, opened it, "moved something in the front . . . and very quickly closed [the bag] again." (*Id.* at 73.)  Bushman observed the corner of a leather pistol pouch, which he recognized from his fifteen years' experience with firearms.  Bushman directed Lambert not to open the suitcase again and asked her about the pistol pouch. Lambert "made a gesture" indicating it was a pistol. (*Id.* at 75.)  Bushman recovered a 9 millimeter firearm from the bag but did not arrest Lambert at that time because "[w]e had nothing to suggest that she was illegally possessing it." (*Id.*)

After the weapon was discovered, Lambert opened a large purse which contained "a small plastic container, very typical for carrying ID, credit cards, things of that nature." (*Id.* at 87.)  Stutz asked Lambert if she had any identification in the case. Bushman testified "[s]he became very upset at that point.  She said that there were pictures in there that she would rather us not see, and no, we couldn't look at that.  We left it at that point." (*Id.* at 87-88.)

Bushman asked Lambert why she had lied to him about the firearm and stated he doubted the truthfulness of her story.  Lambert admitted she had lied about the pistol but said she had told the truth about everything else.  Bushman suggested a crime lab

technician check Lambert's fingerprints in a national database to determine "if she was wanted somewhere"; "if she wasn't, then we would leave her alone and get out of her hair." (*Id.* at 76.)

The officers contacted a crime lab technician who arrived at the motel at 1:39 a.m., took Lambert's fingerprints, and left at 2:36 a.m. The technician obtained a match in a national database. She called Bushman and described some tattoos that Bushman used to verify Lambert's identity. The technician advised Bushman that Lambert had multiple outstanding warrants. The officers arrested her.

Lambert was indicted on one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) and one count of being a fugitive in possession of a firearm in violation of 18 U.S.C. § 922(g)(2). She filed a motion to suppress the firearm found in her motel room arguing: (1) the officers lacked probable cause to enter her room; (2) she did not "freely, knowingly, and voluntarily" consent to the officers' entry into her room; and (3) if she did validly consent to the officers' entry into her room, the officers ignored her instruction not to search her room or certain specific items located therein. (R. Vol. I at 11.)

The court held an evidentiary hearing at which Stutz and Bushman testified. Following the hearing, both parties filed memoranda in support of their respective positions. The government argued Lambert freely and voluntarily consented to the officers' entry into and subsequent search of her motel room and their search did not exceed the scope of her consent. Lambert argued her consent was not valid. She did not claim she was seized.

The court held oral argument on the motion to suppress. Following the hearing, it denied Lambert's motion, concluding her "invitation to officers to enter [her] motel room was unequivocal, specific, and freely given without coercion or duress and, therefore, was voluntarily given." (R. Vol. I at 48.) It also concluded her consent to search the motel room was "unequivocal, specific, and freely given" and the officers did not exceed the scope of the consent. (*Id.* at 49-50.)

Following the denial of her motion, Lambert pled guilty to one count of being a felon in possession of a firearm pursuant to Rule 11(a)(2) of the Federal Rules of Criminal Procedure, thereby preserving her right to appeal from the denial of her motion to suppress. She was sentenced to 37 months imprisonment.

## II.    DISCUSSION

On appeal, Lambert contends she did not voluntarily consent to the search of her possessions because: (1) she provided consent following an illegal seizure and the consent was not sufficiently attenuated from the Fourth Amendment violation; and (2) even if she was not illegally seized, her consent was not voluntary because it was the product of coercion.[1] "In assessing a denial of a motion to suppress, this court accepts the factual findings of the district court, and its determination of witness credibility, unless they are clearly erroneous." *United States v. Chavez*, 534 F.3d 1338, 1343 (10th Cir. 2008) (quotations omitted), *cert. denied*, 129 S. Ct. 953 (2009). We "review[ ] the evidence in the light most favorable to the government." *Id.* (quotations omitted).

---

[1] Lambert does not challenge the officers' entry into her motel room.

- 7 -

## A.     <u>Illegal Seizure</u>

Lambert contends she was seized in violation of the Fourth Amendment because a reasonable person in her position would not have felt free to terminate the encounter with the officers and the officers did not have reasonable suspicion to believe a crime had been or was being committed. She contends the government did not meet its heavy burden of proving her subsequent consent to search her possessions was sufficiently attenuated from the Fourth Amendment violation to be voluntary.

Lambert did not argue her seizure was illegal before the district court. The government contends she cannot make this argument for the first time on appeal. "We have repeatedly declined to allow parties to assert for the first time on appeal legal theories not raised before the district court, even when they fall under the same general rubric as an argument presented to the district court." *United States v. A.B.*, 529 F.3d 1275, 1279 n.4 (10th Cir.), *cert. denied*, 129 S. Ct. 440 (2008). The problem here is even more fundamental because it has to do with the scope of Lambert's appellate waiver. A conditional guilty plea reserves only "the right to have an appellate court review an adverse determination of a specified pretrial motion." Fed. R. Crim. P. 11(a)(2). In analyzing whether a defendant's conditional guilty plea constitutes a waiver of the right to assert a new argument in support of a suppression motion on appeal, this court applies the three-pronged test announced in *United States v. Hahn*, 359 F.3d 1315 (10th Cir. 2004) (en banc). *See United States v. Anderson*, 374 F.3d 955, 957 (10th Cir. 2004). We consider: "(1) whether the disputed appeal falls within the scope of the waiver of appellate rights; (2) whether the defendant knowingly and voluntarily waived his

- 8 -

appellate rights; and (3) whether enforcing the waiver would result in a miscarriage of justice." *Hahn*, 359 F.3d at 1325.

Lambert does not contend she did not knowingly and voluntarily waive her appellate rights; nor does she argue enforcing her appellate waiver would result in a miscarriage of justice. Instead, she argues the issue she seeks to raise on appeal is not within the scope of the appellate waiver because it is implicit in the argument she raised before the district court.

Lambert seeks to argue her consent to the search of her possessions was involuntary because it followed—and was not sufficiently attenuated from—an illegal seizure. Though she had multiple occasions to do so, she never raised this argument in the district court.[2] Instead, she argued she did not voluntarily consent to the officers' entry into her motel room and the subsequent search of her possessions and even if she did validly consent to the search, it exceeded the scope of her consent. Lambert contends whether she was illegally seized is a relevant consideration in determining whether her consent to search was voluntary; she claims "it is another aspect of the voluntariness inquiry conducted by the district court." (Appellant's Reply Br. at 1.) Thus, while she concedes "the district court did not reach an explicit conclusion regarding whether [she] had been detained," she contends such conclusion was implicit in the court's decision. (*Id.* at 4.) We disagree.

While the two arguments are related, they are not the same. "A person who is

---

[2] Lambert could have raised this argument in her motion to suppress, in the memorandum she submitted following the evidentiary hearing or at oral argument on the motion to suppress.

- 9 -

being detained may still give a voluntary consent, but if the detention is illegal, the government must prove that the primary taint has been purged and that the consent was in fact voluntary. The government's burden is therefore heavier if the detention is illegal." *United States v. McRae*, 81 F.3d 1528, 1537 (10th Cir. 1996) (citations omitted). Here, the district court did not decide whether any detention was illegal or, of that matter, whether the government had proved the primary taint from any illegal detention had been purged. That is because Lambert never argued she was illegally detained. "A reservation of the right to appeal a specific pretrial ruling by the district court extends only to theories raised in the challenged ruling." *United States v. Ochoa-Colchado*, 521 F.3d 1292, 1299 (10th Cir. 2008). Lambert cannot raise a new, though related, argument on appeal because the argument falls outside the scope of her reserved appellate rights. *See Anderson*, 374 F.3d at 957-58 (concluding defendant could not raise a new argument in support of motion to suppress on appeal).

B.     **Product of Coercion**

Even if she was not illegally detained, Lambert contends her consent to search was not voluntary because it "was obtained only after the conduct of the police had made it manifest that they could issue orders to her without explanation or justification and search portions of her room and belongings without asking for permission . . . ." (Appellant's Opening Br. at 27.) She states she "belie[ved] . . . she had no alternative to consent." (*Id.*) Lambert did raise this argument before the district court and so we consider it.

"Overnight guests . . . of motel rooms possess reasonable expectations of privacy

- 10 -

in the property on which they are staying." *United States v. Kimoana*, 383 F.3d 1215, 1221 (10th Cir. 2004). While the Fourth Amendment generally prohibits searches conducted without a warrant, "[o]ne of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Id.* (quotations omitted).

"When the government relies on a defendant's consent for the validity of a search, the government bears the burden of proving that defendant's consent was freely and voluntarily given, a determination we make by evaluating the totality of the circumstances." *United States v. Sanchez*, 89 F.3d 715, 718 (10th Cir. 1996). "We have developed a two-step test for determining the voluntariness of a consent to search: the government must (1) proffer clear and positive testimony that consent was unequivocal and specific and freely and intelligently given and (2) prove that this consent was given without implied or express duress or coercion." *Id.* at 719 (quotations omitted).

"Whether [Lambert] freely and voluntarily consented to the search of [her possessions] is a question of fact based on the totality of the circumstances, which we review for clear error." *United States v. Rosborough*, 366 F.3d 1145, 1149 (10th Cir. 2004). "A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. The clearly-erroneous standard is significantly deferential." *United States v. Cruz-Mendez*, 467 F.3d 1260, 1265 (10th Cir. 2006) (quotations and citation omitted).

In determining whether consent was coerced, we consider factors such as:

> the threatening presence of several officers; the brandishing of a weapon by an officer; some physical touching by an officer; use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory; prolonged retention of a person's personal effects . . . ; a request to accompany the officer to the station; interaction in a nonpublic place or a small, enclosed place; and absence of other members of the public.

*United States v. Guerrero*, 472 F.3d 784, 790 (10th Cir. 2007) (quotations omitted).

Three of these factors suggest Lambert's consent might have been coerced, but we are not "left with the definite and firm conviction that a mistake has been committed." *Cruz-Mendez*, 467 F.3d at 1265.

Lambert was questioned by two officers outside her motel room and there were two officers present in Lambert's motel room when she consented to the search of her possessions. We have recognized "the presence of two police officers in a home might be intimidating to the point of negating the voluntariness of consent in some situations." *United States v. Davis*, 40 F.3d 1069, 1078 (10th Cir. 1994). This is not one of those situations as there is nothing in the record to suggest the presence of multiple police officers was threatening. The officers did not brandish their weapons, did not touch Lambert, did not use aggressive language or an aggressive tone of voice, and did not retain any of Lambert's personal effects. Moreover, Lambert's demeanor was pleasant and she did not appear intimidated at any point prior to the discovery of her true identity. *See McRae*, 81 F.3d at 1537 (concluding defendant's consent was voluntary, noting he "seemed relaxed throughout the entire encounter").

Also potentially suggestive of coercion is the fact the officers interacted with Lambert in a nonpublic place—her motel room—in the absence of any other members of

the public.  However, the officers did not ask to enter Lambert's motel room.  Instead, they began their questioning of Lambert in public, outside of her motel room.  It was Lambert who invited the officers to enter her room.  It was also Lambert who told Sergeant Bushman he could "check" to see whether she had something to do with selling the gun and the laptop.  (R. Supp. Vol. I at 69.)  Bushman did not expressly request Lambert's consent, which suggests Lambert's consent was not coerced.  *See Rosborough*, 366 F.3d at 1149 (concluding defendant's consent to the search of his vehicle was voluntary where, *inter alia*, the officer did not ask defendant for consent to search; "to the contrary, [the defendant] himself volunteered permission to [the officer] to search his car").

Lambert argues: "The police . . . indicated, both implicitly and explicitly, that they would not leave until [she] provided them with sufficient information to persuade them she was being truthful, making it clear that [she] was not free to terminate the encounter with them."  (Appellant's Opening Br. at 9.)  The government does not contend the officers informed Lambert she had a right not to allow Bushman to search her belongings, but that is immaterial.  "The fact that officers do not specifically inform an individual that he or she has the right to refuse to consent to a search does not render that search coercive."  *Davis*, 40 F.3d at 1078.  It would be odd for an officer to inform an individual she does not have to consent to a search when he never asks for her consent in the first place.  In any case, it appears Lambert was aware she did not have to allow the officers to search her belongings.  After the officers located the firearm, Lambert told the officers they could not look in her ID case and they "left it at that point."  (R. Supp. Vol. I

- 13 -

at 87-88.) Lambert's instruction suggests she did not feel unable to revoke or limit her consent. *See Rosborough*, 366 F.3d at 1149 (the fact defendant "affirmatively asked to terminate the encounter" after a canine alert "undermin[ed] his claim that he felt unable to revoke his consent").

Lambert claims her consent was coerced because the officers' commanding presence in her motel room stripped her of control and plainly suggested she had no choice but to submit to the officers' continued questioning and consent to a search of her possessions. Her argument is not without merit. The officers (probably) turned on the lights in her motel room; they denied her request for permission to smoke (in her room); they briefly looked into her open purse without her consent; they thought she was lying and told her so; they searched the bathroom for weapons; they then ordered her to get dressed in the bathroom with the door closed. While we understand how these actions could create a coercive environment, for the most part, the officers appear to have been motivated by legitimate concerns and did not act unreasonably.

We understand why two male officers might have been uncomfortable in the presence of a minimally-clothed woman in a darkened motel room, motivating them to turn on the lights and ask Lambert to get dressed. Given the size and layout of the motel room, the bathroom was not an unreasonable place for Lambert to get dressed. Though Lambert might have wanted to keep an eye on the officers while she changed clothes, the officers were reasonably and understandably concerned when she began to undress without closing the door. Officer Stutz thought Lambert might have been creating "some kind of situation." (R. Supp. Vol. I at 25.)

- 14 -

We are likewise relatively untroubled by the officers' search of Lambert's open purse (by briefly shining a light into it). The officers were responding to a report of a woman attempting to sell a firearm and a laptop. They were thus legitimately concerned Lambert had a weapon and they believed (not unreasonably, as it turns out) she was not answering their questions truthfully. The search of Lambert's purse was permissible. *See Cruz-Mendez*, 467 F.3d at 1266 ("[A]n officer's mere observation of an item left in plain view . . . generally involves no Fourth Amendment search. For a mere observation to be valid, the only requirement is that the officer be lawfully in a position from which he can view the object.") (quotations and citation omitted). The fact the officers used a flashlight to illuminate the purse does not render the search unlawful. *See id.* ("[T]he use of [artificial means] to illuminate a darkened area . . . does not constitute a search, and thus triggers no Fourth Amendment protection.") (quotations omitted).

The officers' search of the bathroom cannot be so easily justified. While it appears to have been motivated by a legitimate concern for officer safety, it was not a protective sweep because it was not conducted incident to Lambert's arrest. *See United States v. Walker*, 474 F.3d 1249, 1254 (10th Cir. 2007) ("[A] 'protective sweep' of a residence to ensure officer safety may take place only incident to an arrest."). The officers searched the bathroom before the firearm was discovered and before asking Lambert to enter the bathroom unsupervised. The search of the bathroom appears to have been unlawful, but that is not the question we are called upon to determine. No evidence was discovered in the bathroom search and our review is limited to determining whether Lambert's consent was coerced. Though the officers may have exceeded the scope of

their authority in searching the bathroom, we perceive no clear error in the district court's conclusion that Lambert's subsequent consent to search her belongings was not coerced.

Similarly, the government does not claim the officers had a legitimate basis for denying Lambert's request to smoke. This is cause for concern as it suggests Lambert felt the need to ask permission for an action she should have been able to take in her own room and felt the need to obey the officers' directive not to smoke. It is particularly troubling when considered in conjunction with the other assertions of authority made by the officers. But Lambert does not directly challenge the officers' denial of her right to smoke and, in evaluating whether her consent was coerced, we are to consider the totality of the circumstances. Here, those circumstances include Lambert's express invitation to Officers Stutz and Carson to enter her motel room and her express invitation to Sergeant Bushman to search her belongings. Those circumstances also include Lambert's instruction not to search her ID case, an instruction which the officers respected. Our review is highly deferential and, viewing the circumstances as a whole, we perceive no clear error in the district court's conclusion that Lambert's consent to search her possessions was voluntary and not coerced.

**AFFIRMED.**

**Entered by the Court:**

**Terrence L. O'Brien**
United States Circuit Judge