984 So.2d 592 (2008)
Rafael LUNA-MARTINEZ, Appellant,
v.
STATE of Florida, Appellee.
Case No. 2D05-2665.
District Court of Appeal of Florida, Second District.
June 11, 2008.
*595 James Marion Moorman, Public Defender, and Dan Hallenberg, Special Assistant Public Defender, Bartow, for Appellant.
Bill McCollum, Attorney General, Tallahassee, and Dale E. Tarpley, Assistant Attorney General, Tampa, for Appellee.
CANADY, Judge.
This case arose from the events that unfolded during a knock-and-talk encounter between the police and the defendant, Rafael Luna-Martinez, at the defendant's apartment. Luna-Martinez has presented three issues in this appeal of his judgments and sentences for trafficking in heroin and other drug offenses. We reject two of those issues as grounds for reversal without further comment. We write to address Luna-Martinez's argument that the consent he gave for the search of his apartment was involuntary and that the trial court therefore erred in denying the motion to suppress the fruits of that search. For the reasons we explain, we conclude that the trial court was correct in ruling that the consent to search was voluntary.

I. Background

The basic circumstances of the defendant's encounter with the police in Highlands County are set forth in the trial court's order denying the motion to suppress:
On March 26, 2003[,] at approximately 3:00 a.m., Det. Jose Feliciano and other members of law enforcement approached the residence of the defendant and his wife to conduct a "knock and talk" interview with the defendant. After initial contact by English speaking officers stalled, Det. Feliciano approached the defendant and his wife and asked for consent to enter the residence and search for contraband that police had received a tip was present within the residence. The defendant was polite and cooperative[,] and he gave consent for the officers to search. Det. Feliciano engaged the defendant and his wife in conversation in the kitchen. The defendant did not withdraw his consent for the search or limit the scope of the search at any time. After a trafficking amount of heroin was found in the residence, the defendant made spontaneous statements that the narcotics belonged to him and that his wife was unaware of their presence.
Inv. Tyrone Tyson, of the Highlands County Sheriff's Office, testified that initial contact with the defendant and his wife was made by means of a ruse. A uniformed deputy approached the defendant's residence at 3:00 a.m. and told the defendant and his wife that their car had been burglarized in the parking lot. Once contact was made with all adult members of the residence, Inv. Tyson told the defendant and his wife of the ruse, stated the officers' real purpose for being there, and asked for consent to search. Inv. Tyson's contact was unsatisfactory due to a language barrier, so Inv. Tyson turned the interview over to Det. Feliciano. After Det. Feliciano informed Inv. Tyson that he had obtained consent to search from the defendant, Inv. Tyson was a part of the search *596 team that discovered and collected a trafficking amount of heroin from the upstairs bathroom.
At the hearing on the motion to suppress, conflicting testimony was given by law enforcement officers concerning whether consent was obtained from the defendant at the threshold of the apartment or after officers had entered some distance into the foyer of the apartment. It is apparent from the trial court's finding that the police "asked for consent to enter the residence" that the court credited the testimony that consent was obtained at the threshold.
There was no inconsistency in the law enforcement testimony that the defendant consented to the search and that he was subjected to no coercion. The officer who obtained the consent testified that his "tone of voice" in speaking to the defendant was "very amicable" and "[v]ery low." That officer also testified that he advised the defendant of his Miranda[1] rights before asking for consent and that during the encounter no guns were drawn and the defendant was not handcuffed. Another officer characterized the request for consent as a "very casual" request and stated that the defendant "appeared to be alert and aware" and was somewhat "talkative" and "nervous." The defendant, on the contrary, testified that he did not give consent to search the apartment. He testified instead that when he demanded a search warrant from the officers, he was told to sit down and be quiet.
The record reflects that numerous officers and law enforcement vehiclesfrom Hillsborough County as well as Highlands Countywere at the scene. There was testimony, however, that several of the officers from Hillsborough County were not "right there where" the officers were speaking with the defendant to request consent to search. In the defendant's testimony, there is no indication that he interacted with or observed more than three or four officers.
In its order, the trial court explicitly determined that the police had not engaged in any improper conduct, discredited the defendant's testimony regarding the conduct of the police, and concluded that the consent to search was valid:
The Court finds that the ruse used by law enforcement to make initial contact with the defendant does not rise to the level of police misconduct. Further, based upon the circumstances of this case, there was nothing inappropriate about law enforcement['s] contacting the defendant in his residence at 3:00 a.m. The defendant was polite and cooperative, and both the defendant and his wife gave free, knowing, and voluntary consent for law enforcement to enter and search their residence.
The Court finds that no intimidation, threats, force, or coercion were employed by law enforcement against the defendant or his wife[ ] and finds any statements made to the contrary by the defendant at motion to suppress to be not credible. Based upon the totality of the circumstances in this matter, the Court finds that the defendant did not merely acquiesce to police presence and authority[ ] but did give valid consent to enter and search his residence.
The Court further finds that the defendant had some knowledge of the legal system and his rights prior to this incident. . . .

II. Argument on Appeal

The defendant argues that his consent to search was not free and voluntary but *597 was instead merely a submission to the police officers' show of authority. In support of this argument, the defendant relies primarily on (a) the circumstance that the knock-and-talk encounter occurred at 3 o'clock in the morning, (b) the deception used by police in initiating contact with the defendant, and (c) the number of officers involved in the encounter with the defendant. The defendant also points to (d) the absence of an express warning by the police to the defendant that he was free to refuse consent to search, (e) the absence of a written consent to search, and (f) the circumstance that the defendant was given his Miranda rights and was informed that he was the target of an investigation. The defendant places special reliance on Kutzorik v. State, 891 So.2d 645 (Fla. 2d DCA 2005), in support of his claim that the consent was not voluntary.
The State argues in response that in the absence of any indication of intimidation or coercion by the police, the factors relied on by the defendant are insufficient to establish that the consent was involuntary.

III. Analysis

A. Standard of Review

In reviewing the trial court's ruling on the motion to suppress, we are governed by the standard that "mixed questions of law and fact that ultimately determine constitutional rights should be reviewed . . . using a two-step approach, deferring to the trial court on questions of historical fact but conducting a de novo review of the constitutional issue." Connor v. State, 803 So.2d 598, 605 (Fla.2001). As to questions of historical fact, deferential review requires that we "interpret the evidence and reasonable inferences and deductions derived therefrom in a manner most favorable to sustaining the trial court's ruling." Pagan v. State, 830 So.2d 792, 806 (Fla.2002).
Here, the constitutional issue of the reasonableness of the search turns on the voluntariness of the consent to search. "Ultimately the question whether a [consent to search] is voluntary presents a legal issue to an appellate court, one that is determined de novo under federal constitutional principles." Brancaccio v. State, 773 So.2d 582, 583 (Fla. 4th DCA 2000).

B. The Legality of Consent Searches

Although warrantless entries of dwellings are generally forbidden, see Payton v. New York, 445 U.S. 573, 585, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), a warrantless search of a dwelling may be authorized by consent, see Georgia v. Randolph, 547 U.S. 103, 106, 126 S.Ct. 1515, 164 L.Ed.2d 208 (2006); United States v. Matlock, 415 U.S. 164, 171, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). "[A] search pursuant to consent," if "properly conducted, is a constitutionally permissible and wholly legitimate aspect of effective police activity. But the Fourth and Fourteenth Amendments require that a consent not be coerced, by explicit or implicit means, by implied threat or covert force." Schneckloth v. Bustamonte, 412 U.S. 218, 228, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). "[I]t is only by analyzing all the circumstances of an individual consent that it can be ascertained whether in fact it was voluntary or coerced." Id. at 233, 93 S.Ct. 2041. "In examining all the surrounding circumstances to determine if in fact the consent to search was coerced, account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents." Id. at 229, 93 S.Ct. 2041.
Accordingly, "[w]hen a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in *598 fact, freely and voluntarily given. This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority." Bumper v. North Carolina, 391 U.S. 543, 548-49, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968) (footnote omitted). "When a law enforcement officer claims authority to search . . ., he announces in effect that the [suspect] has no right to resist the search." Id. at 550, 88 S.Ct. 1788. Such a "situation is instinct with coercion," and "[w]here there is coercion there cannot be consent." Id. Just as coercion generally may be exercised "by explicit or implicit means," Schneckloth, 412 U.S. at 228, 93 S.Ct. 2041, a claim of authority to search may be made either explicitly or implicitly.
"[T]he absence of proof" that a person giving consent to search "knew he could withhold his consent" does not compel the conclusion that the consent was invalid. United States v. Watson, 423 U.S. 411, 424, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976). Although the absence of such proof "may be a factor in the overall judgment," it "is not to be given controlling significance." Id. "[K]nowledge of a right to refuse is not a prerequisite of a voluntary consent." Schneckloth, 412 U.S. at 234, 93 S.Ct. 2041. Furthermore, while knowledge of the right to refuse is a relevant factor in the analysis of voluntariness, there is no "presumption of invalidity [which] attaches if a citizen consented without explicit notification that he or she was free to refuse to cooperate. Instead, . . . the totality of the circumstances must control, without giving extra weight to the absence of this type of warning." United States v. Drayton, 536 U.S. 194, 207, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002).
In brief, the voluntariness of a consent to search depends on whether given the totality of relevant circumstances"a reasonable person would understand that he or she [was] free to refuse" consent. Id. at 197, 122 S.Ct. 2105. A defendant's consent will be considered involuntary only if "in the totality of the circumstances, [the defendant's] consent was not his own `essentially free and unconstrained choice' because his `will ha(d) been overborne and his capacity for self-determination critically impaired.'" Watson, 423 U.S. at 424, 96 S.Ct. 820 (quoting Schneckloth, 412 U.S. at 225, 93 S.Ct. 2041).
Where the police have not engaged in illegal conduct, the State bears the burden of showing the voluntariness of a consent to search by a preponderance of the evidence. Reynolds v. State, 592 So.2d 1082, 1086 (Fla.1992). "Where there is an illegal detention or other illegal conduct on the part of the police, a consent will be found voluntary only if there is clear and convincing evidence that the consent was not a product of the illegal police action." Id.

C. Knock-and-Talk Encounters

"A `knock and talk'" encounter "is a procedure [ordinarily] used by police officers to investigate a complaint where there is no probable cause for a search warrant." Murphy v. State, 898 So.2d 1031, 1032 n. 4 (Fla. 5th DCA 2005). In employing this procedure, "police officers knock on the door, try to make contact with persons inside, and talk to them about the subject of the complaints" underlying the investigation. Id. Such a consensual encounter may lead to a request by the police for voluntary consent to conduct a search. "Courts generally have upheld [the knock-and-talk] investigative procedure as a legitimate effort to obtain a suspect's consent to search." United States v. Chambers, 395 F.3d 563, 567 n. 2 (6th Cir.2005). The key to the legitimacy of the knock-and-talk techniqueas well *599 as any other technique employed to obtain consent to searchis the absence of coercive police conduct, including any express or implied assertion of authority to enter or authority to search. In properly initiating a knock-and-talk encounter, the police should not "deploy overbearing tactics that essentially force the individual out of the home." United States v. Thomas, 430 F.3d 274, 277 (6th Cir.2005). Nor should "overbearing tactics" be employed in gaining entry to a dwelling or in obtaining consent to search.

D. The Voluntariness of Luna-Martinez's Consent

Giving due deference to the trial court's determinations of historical fact, we turn to our de novo review concerning the ultimate issue of voluntariness. Given the factual determinations made by the trial court, we conclude that the police did not engage in any misconduct and that the defendant's consent to search was given voluntarily. The factors relied on by the defendant to establish the involuntariness of his consent are collectively insufficient to demonstrate that the police made a claim of authority to search or that the defendant was otherwise subjected to coercion. Although the factors relied on by the defendant are properly considered in evaluating the totality of the circumstance, in the context presented by this case, those factors do not show that a reasonable person in the defendant's circumstances would have not "underst[ood] that he or she [was] free to refuse" consent. Drayton, 536 U.S. at 197, 122 S.Ct. 2105. Here, the record supports the conclusion that the police did not make use of any "overbearing tactics," Thomas, 430 F.3d at 277, and that the defendant's "`will'" was not "`overborne,'" Watson, 423 U.S. at 424, 96 S.Ct. 820 (quoting Schneckloth, 412 U.S. at 225, 93 S.Ct. 2041).
Contrary to the defendant's contention, the circumstance that an encounter between the police and a defendant takes place in the middle of the night does not militate strongly toward the conclusion that the ensuing consent was involuntary. The late hour of the encounter is a relevant factor to consider in the totality of the circumstances, see Kutzorik, 891 So.2d at 648, but it does not carry the great weight suggested by the defense. Due to the exigencies of public safety, it is not unusual for the police in their investigative efforts to have late night encounters with individuals. "Although the fact that the officers came to [the defendant's] apartment in the early morning hours suggests an urgency to their mission, such an impression of urgency did not in itself subject [the defendant] to a restraint on his freedom" or communicate to him that he "had no choice but to" agree to the search requested by the police. State v. Pitts, 936 So.2d 1111, 1125 (Fla. 2d DCA 2006); see also Connor, 803 So.2d 598 (upholding validity of consent to search obtained by police during 2 a.m. encounter at defendant's home). It is also noteworthy here that any suggestion that the lateness of the hour implied a "vulnerable subjective state," Schneckloth, 412 U.S. at 229, 93 S.Ct. 2041, of the defendant was rebutted by the testimony that the defendant "appeared to be alert and aware."
The defendant's reliance on the ruse employed by the police is likewise misplaced. In and of itself, police "[d]eception does not negate consent." Wyche v. State, 906 So.2d 1142, 1144 (Fla. 1st DCA 2005). Here the ruse was used only to initiate contact with the occupants of the defendant's apartment. Once the police explained their true purpose, any potential impact of the earlier deception on the defendant's consent to search was either eliminated or substantially diminished. *600 See Brown v. State, 378 Md. 355, 835 A.2d 1208, 1213 (2003) ("The earlier deception that induced appellant to open the door had no erosive effect on the consent to enter or the consent to search.").
The number of officers involved in an encounter may well have a significant bearing on the voluntariness of a consent obtained in that encounter. See Miller v. State, 865 So.2d 584 (Fla. 5th DCA 2004). An individual confronted by a large number of officers may be more likely to conclude that he lacks the freedom to decline their requests. That does not mean, however, that there is a necessary correlation between the number of officers present and the coerciveness of the encounter. A suspect is more likely to be overawed by one officer speaking in an insistent, demanding tone than is a suspect who is addressed in a low-key manner in an encounter with several officers.
Here, although there were several officers outside the defendant's apartment, the defendant's own testimony does not indicate an awareness of the presence of any more than three or four officers who were in his apartment. Even though the presence of such a number of officers might heighten the potential for coercion, given the other circumstances present here, we conclude that the number of officers present did not have a coercive impact on the defendant. See Connor, 803 So.2d 598 (upholding validity of consent to search obtained from defendant when several officers went to defendant's home); United States v. Cruz-Mendez, 467 F.3d 1260, 1265-66 (10th Cir.2006) (rejecting claim that consent was necessarily coerced when multiple officers were present).
In evaluating the totality of circumstances, consideration is appropriately given both to the absence of a written consent to search, see Wilson v. State, 952 So.2d 564 (Fla. 5th DCA 2007), and to the absence of a warning concerning the right to refuse consent, see Drayton, 536 U.S. at 207, 122 S.Ct. 2105. Although the presence of a written consent tends to support the conclusion that the consent was given voluntarily, an inference of involuntariness does not arise from the absence of a written consent. Similarly, it is inappropriate to give "extra weight to the absence" of a warning of the right to refuse consent. Id.
The fact that an individual is informed that she is suspected of criminal activity may combine with other circumstances to demonstrate that the police will not take no for an answer to their request for permission to search. See Kutzorik, 891 So.2d at 648; Miller, 865 So.2d at 588. Of course, even in the absence of an explanation of their suspicions by the police, a reasonable person whose permission is sought for a search will understand that such a request is ordinarily predicated on some suspicion by the police that the area to be searched may contain evidence of a crime. A reasonable person will surely understand that ordinarily the police do not randomly knock on doors requesting consent to search. The suspicion underlying nearly every request for consent to search does not in and of itself point to coercion. If an individual is informed of the suspicions of the police in a hectoring manner, however, the specter of coercion may arise. Likewise, when the police unequivocally assert that they "know" the suspect is hiding contraband, that circumstance may point to the conclusion that the suspect reasonably believed he would be required to allow a search. See Kutzorik, 891 So.2d at 648 (discussing "announcement that the police suspected a crime and knew drugs were on the premises"). Here, the defendant was simply informed that the police had received a tip that there was contraband in his apartment.
*601 While the giving of Miranda warnings is a prerequisite to custodial interrogation, the warnings may be given to individuals who are not in custody. And the mere giving of Miranda warnings does not transform a suspect's status from noncustodial to custodial. We reject any suggestion that the giving of the warnings to the defendant here in itself indicated that he had been taken into custody. See Davis v. Allsbrooks, 778 F.2d 168, 172 (4th Cir.1985) (rejecting claim that "the reading of Miranda warnings to a suspect should by itself create custody"); United States v. Lewis, 556 F.2d 446, 449 (6th Cir.1977) (rejecting argument that "[t]he precaution of giving Miranda rights" should be "interpret[ed] . . . as a restraint on the suspect, converting a non-custodial interview into a custodial interrogation"); see also State v. Lewis, 518 So.2d 406, 408 (Fla. 3d DCA 1988) (holding that status of encounter was not transformed "from a stop to an arrest by the fact that Miranda warnings were given"). But see Raysor v. State, 795 So.2d 1071, 1071 (Fla. 4th DCA 2001) (en banc) (holding "that when [an] officer read appellant his Miranda rights during a consensual encounter, the encounter was no longer consensual").
In the context presented by this case, the Miranda warnings weigh in favor of the conclusion that the consent was voluntary. Although not precisely equivalent to a warning that the defendant was free to refuse consent, the Miranda warnings performed a similar function by informing the defendant that he need not talk to the police at all. See United States v. Lara, 638 F.2d 892, 898 (5th Cir.1981) (observing that "giving the [Miranda] warning . . . might tend to support a finding of no seizure").
Finally, we reject the defendant's reliance on Kutzorik. Although there are some significant similarities between the facts of the instant case and the facts of Kutzorik, there are salient differences. Kutzorik is distinguishable from the instant case because the court there determined that there were "repeated requests for consent to search when the resident was in an emotional state." 891 So.2d at 648. Such repeated requests for consent may be significant in showing that the ostensible request was in reality a demand. And a suspect's being in an "emotional state" is relevant to his "vulnerable subjective state." Schneckloth, 412 U.S. at 229, 93 S.Ct. 2041. Both factors are entitled to considerable weight. Here, however, there were no "repeated requests for consent" and the defendant was not in "an emotional state."
In their encounter with Luna-Martinez, the police conducted themselves in a way that was not coercive. The manner in which consent was requested supports the conclusion that the giving of consent was not a mere acquiescence to a show of authority. The defendant was addressed in a "very amicable," "very casual" manner. His response to the officers was "polite and cooperative." There is no indication that the police said anything that a reasonable person would understand as an assertion of authority to search. And the defendant gave his consent after being informed that he had the right not to talk with the police.
It is significant that the defendant testified that he demanded a search warrant. Although the trial court credited the officer's testimony concerning the giving of consent, the defendant's testimony regarding his demand for a search warrant supports the trial court's finding that the defendant "had some knowledge of the legal system and his rights prior to this incident." The defendant's testimony regarding his demand for a search warranttestimony which evidences knowledge of *602 the general right to insist that a search be authorized by a warrantseriously undermines the defendant's argument that in granting consent he was merely acquiescing to a show of authority. See United States v. De Ciccio, 190 F.Supp. 487, 490 (E.D.N.Y.1961) (upholding validity of consent search and observing that "[i]f the testimony of the defendant were to be believed, he knew his rights because he said he demanded a search warrant"); see also United States v. Jacobs, 125 Fed. Appx. 518, 523 (5th Cir.2005) (upholding determination by trial court that defendant's "inquiry as to whether [police] had a search warrant . . . demonstrated that [defendant] was aware that she had the right to refuse consent to the search"); Grant v. State, 709 S.W.2d 355, 357-58 (Tex.Ct.App. 1986) (stating that where defendant told officer that he could search "if you have a search warrant," it was "obvious that [defendant] was aware of the warrant requirements for searches and, therefore, was not ignorant of her legal rights").

IV. Conclusion

Based on the totality of circumstances, the State met its burden of establishing that the consent to search was voluntary. The substantial factors supporting the conclusion that the consent was voluntary outweigh the circumstances militating toward a conclusion of involuntariness. The trial court did not err in denying the motion to suppress.
Affirmed.
DAVIS, J., Concurs.
VILLANTI, J., Dissents with opinion.
VILLANTI, Judge, Dissenting.
I respectfully dissent because in my view the majority does not properly apply the legal analysis required when considering the issue of the voluntariness of a search conducted pursuant to consent. When the analysis is properly applied, it becomes clear that the consent given by Luna-Martinez was not freely and voluntarily given. Accordingly, the evidence obtained pursuant to the search should have been suppressed.
There is no dispute that a search conducted pursuant to a citizen's voluntary consent is constitutionally permissible. Schneckloth, 412 U.S. at 222, 93 S.Ct. 2041. However, "[w]hen a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given." Id. (quoting Bumper, 391 U.S. at 548, 88 S.Ct. 1788); Taylor v. State, 855 So.2d 1, 17 (Fla.2003). In this case, the trial court found that Luna-Martinez consented to the search of his residence. Luna-Martinez does not dispute that he permitted the officers to search; however, he contends that he did not do so voluntarily but instead simply acquiesced to the officers' show of authority. Thus, the sole question in this case is whether Luna-Martinez's consent was voluntary.
As a general rule, consent is not considered voluntary if the evidence shows that the officers' actions would have led a reasonable person to conclude that he or she was not free to decline the officers' requests and that the person has merely acquiesced to the officers' show of authority. Florida v. Bostick, 501 U.S. 429, 439, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991). When considering whether a specific factual situation reflects a free and voluntary consent, the Supreme Court has held that there is "no talismanic definition of `voluntariness' " that is "mechanically applicable to the host of situations where the question has arisen." Schneckloth, 412 U.S. at 224, 93 S.Ct. 2041. Instead, "the question whether a consent to a search was in fact `voluntary' or was the product of duress or coercion, express or implied, is a question *603 of fact to be determined from the totality of all the circumstances." Id. at 227, 93 S.Ct. 2041 (emphasis added).
Here, the majority's analysis, while containing correct legal principles, evaluates several factors that are to be considered when determining voluntariness and finds that each of those factors, standing in isolation, is constitutionally permissible. For example, the majority cites to cases holding that officers' arrival at an individual's home late at night does not automatically render that individual's consent to cooperate with the officers involuntary. See, e.g., Connor, 803 So.2d at 598; Pitts, 936 So.2d at 1125.[2] The majority also cites to cases holding that the arrival of more than one officer at the individual's door does not necessarily render that individual's consent to cooperate with the officers involuntary. See, e.g., Cruz-Mendez, 467 F.3d at 1265-66; Connor, 803 So.2d at 598. In addition, the majority cites to numerous cases holding that simply advising an individual of his Miranda rights does not transform an otherwise consensual encounter into a detention. See, e.g., Lewis, 518 So.2d at 408.
However, the majority does not cite a single case in which the constellation of factors present in this case was found to result in a voluntary consent to search. Here, the police knocked on Luna-Martinez's door at 3 a.m. They used a ruse to get Luna-Martinez's wife to rouse him from sleep and come downstairs. When Luna-Martinez got downstairs, he was confronted with one uniformed police officer and two plainclothes detectives crowded into his doorway. Because Luna-Martinez did not speak English well, a fourth officer was called. This fourth officer entered the foyer of Luna-Martinez's residence, informed Luna-Martinez that he and his fellow officers were conducting a narcotics investigation, informed Luna-Martinez that they suspected that narcotics were present in his residence, advised Luna-Martinez of his Miranda rights, and immediately requested consent to search the residence. Luna-Martinez was not informed of his right to refuse consent to the search, and no written consent to search was obtained.[3] In light of the totality of all of these circumstances, I do not believe *604 that any reasonable person would believe that he or she was free to decline the officers' request to search the residence.
In contrast to the cases cited by the majority, I believe this court properly applied the totality of the circumstances analysis in Kutzorik, 891 So.2d at 645, and I find the majority's attempt to distinguish that case unpersuasive. In Kutzorik, this court found significant the facts that three police officers knocked on the door of Kutzorik's residence at 10 p.m., came into the foyer when she opened the door, told her that they had received a complaint that someone was selling marijuana from the residence, and requested consent to search. In doing so, this court held that because a person's home is the place where he or she "enjoys the highest expectation of privacy," "the factors bearing on the voluntariness of a consent to search must be specially scrutinized." Id. at 648. This court also held that the fact that Kutzorik knew she was the target of the investigation and that the officers believed she was hiding drugs in her house suggested that the encounter was not consensual. Id. In addition, the fact that she was confronted by three police officers "was likely alarming to her." Id.
The majority distinguishes Kutzorik on the sole basis that it involved "repeated requests for consent to search when the resident was in an emotional state," which were not present in this case. Id. However, when considering the "totality of all the circumstances," Schneckloth, 412 U.S. at 227, 93 S.Ct. 2041, I believe the facts in this case are even more compelling. Not only was Luna-Martinez confronted by three police officers at the door of his home at 3 a.m. and told that the police believed that he was hiding narcotics in his house, but he was also read his Miranda rights. While it is true that this single factor is not dispositive, "[g]iving Miranda warnings in a police-citizen encounter which is otherwise a nondetention interrogation may very well elevate such an encounter to a seizure within the meaning of Terry [v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968),] in light of the public's association of Miranda warnings with an arrest." Lara, 638 F.2d at 898 n. 10. Thus, while Kutzorik's emotional state was certainly a factor weighing against the voluntariness of her consent, the officers' decision to advise Luna-Martinez of his Miranda rights in this case was equally indicative of coercion, if not more so.
I believe that the majority's focus on the propriety of each factor in isolation results in it reaching the incorrect result, effectively dismantles the totality of the circumstances analysis, and has the net effect of reducing the State's burden to prove an exception to the warrant requirement. Given the totality of the circumstances present in this case, I would reverse the judgment and sentence, reverse the trial court's order denying Luna-Martinez's dispositive motion to suppress, and remand for discharge.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] I would note that at common law searches of a dwelling were forbidden between dusk and dawn unless there was a showing of necessity. See Tracey Maclin, The Complexity of the Fourth Amendment: A Historical Review, 77 B.U.L.Rev. 925, 971 (1997); see also Monroe v. Pape, 365 U.S. 167, 210, 81 S.Ct. 473, 5 L.Ed.2d 492 (Frankfurter, J., concurring in part and dissenting in part) (discussing the common law on searches and noting that "[s]earches of the dwelling house were the special object of this universal condemnation of official intrusion. Night-time search was the evil in its most obnoxious form."), overruled on other grounds by Monell v. Dep't of Social Servs., 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); cf. Fed.R.Crim.P. 41(e)(2)(A)(ii) (requiring a search warrant issued by a magistrate to be executed in the daytime unless good cause is shown). Of the three cases cited by the majority for the proposition that a nighttime encounter does not automatically render consent to search involuntary, only one dealt with the nighttime search of a residence, and that case found the consent involuntary. Kutzorik, 891 So.2d at 648. The other two cases dealt with an individual's consent to accompany officers to the police station for questioning, a fact pattern not implicated in this case. Connor, 803 So.2d at 598; Pitts, 936 So.2d at 1125.
[3] Indeed, the "knock and talk" technique is implemented in the hope that the occupant will give consent to search in a situation in which the officers do not have the probable cause necessary to obtain a search warrant. Murphy, 898 So.2d at 1032 n. 4. Advising Luna-Martinez of his right to refuse to consent would not have furthered this purpose. However, had the officers advised Luna-Martinez of his right to refuse to consent, they would likely have avoided his claim of coercion, and I would be less concerned with the "knock and talk" used in this case.