LaROSE, Judge.
 

 Gerardo Hardin appeals his conviction and sentence for cocaine trafficking.
 
 See
 
 § 893.135, Fla. Stat. (2003). He argues that the trial court should have granted his motion to suppress evidence. We agree and reverse.
 
 [1]
 

 Factual Background
 

 Sheriffs Deputies Launikitis and Glas-scock
 
 [2]
 
 were patrolling a Motel 6 parking lot in Hillsborough County. They saw a parked car with a Brownsville, Texas, license plate. Because they considered Brownsville a center of illegal drug activity, the deputies decided to investigate further. They questioned the motel clerk, who gave them the room information associated with the car. Mr. Hardin and his wife, Juana Sierra, were motel guests. The deputies’ suspicion heightened further because the name on the car’s registration differed from that in the motel’s guest records.
 
 [3]
 
 The car, however, was not reported stolen. Armed with this seemingly benign information, the deputies suspected that drug activity was afoot.
 

 The deputies approached the motel room, knocked on the door, and engaged Mr. Hardin in conversation. A “knock and talk” is a purely consensual encounter, which officers may initiate without any objective level of suspicion.
 
 State v. Triana,
 
 979 So.2d 1039, 1043 (Fla. 3d DCA),
 
 rev. denied,
 
 991 So.2d 389 (Fla.2008);
 
 see also United States v. Thomas,
 
 430 F.3d 274, 277 (6th Cir.2005);
 
 People v. Rivera,
 
 41 Cal.4th 304, 59 Cal.Rptr.3d 473, 159 P.3d 60, 61-62 (2007). Mr. Hardin went outside to speak with Deputy Launikitis, a male. Deputy Launikitis asked Mr. Hardin if the car was his. He replied that it belonged to his wife’s sister.
 

 Mr. Hardin’s naked wife remained in bed under the sheets. Deputy Glasscock, a woman, asked if she could enter the motel room to talk with Ms. Sierra. Mr. Hardin consented. Once inside, Deputy Glasscock concluded that she would need a translator; Ms. Sierra did not speak English. Deputy Baez, a male, arrived some twenty minutes later. He entered the room to translate for Deputy Glasscock. Deputy Launikitis remained outside with Mr. Hardin. All deputies were in uniform and armed.
 

 The deputies warned Mr. Hardin and Ms. Sierra that they were looking for illegal drugs. Deputy Launikitis obtained Mr. Hardin’s consent to search the car. Deputy Launikitis called in a K-9 unit. No drugs were found. Meanwhile, Deputies Glasscock and Baez obtained Ms. Sierra’s consent to search the motel room.
 
 *1248
 
 They found nothing. Deputy Launikitis then joined Deputies Glasscock and Baez in the motel room. Mr. Hardin remained outside with the K-9 deputy; Ms. Sierra remained in bed, naked under the sheets.
 

 Despite the fruitless searches of the car and motel room, the deputies badgered Ms. Sierra, telling her that they knew she had drugs. They promised not to charge her if she cooperated. Ms. Sierra responded that she wanted no trouble. The deputies continued to badger her. Ms. Sierra relented and handed them a purse containing cocaine from under the sheets. The male deputies then left the room while Ms. Sierra dressed.
 
 [4]
 
 In the parking lot, Mr. Hardin shouted that the drugs were his. He was arrested.
 
 [5]
 

 Eventually, Mr. Hardin pleaded guilty to trafficking in cocaine, reserving for appeal the dispositive order denying his motion to suppress.
 

 Analysis
 

 Mr. Hardin argues that the trial court erroneously denied his motion to suppress because his wife did not voluntarily turn over the contraband.
 
 [6]
 
 In reviewing the trial court’s order, we defer to the trial court’s factual findings but review its application of law de novo.
 
 See Connor v. State,
 
 803 So.2d 598, 605 (Fla.2001);
 
 Luna-Martinez v. State,
 
 984 So.2d 592, 597 (Fla. 2d DCA 2008),
 
 rev. denied,
 
 11 So.3d 942 (Fla.2009).
 

 Warrantless searches are per se unreasonable and violate the Fourth Amendment.
 
 Smith v. State,
 
 753 So.2d 713, 715 (Fla. 2d DCA 2000);
 
 see also Coolidge v. New Hampshire,
 
 403 U.S. 443, 454-55, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971),
 
 overruling on other grounds recognized by O’Rourke v. Hayes,
 
 378 F.3d 1201, 1208 (11th Cir.2004). Consent, of course, is an exception to this general rule.
 
 Smith,
 
 753 So.2d at 715;
 
 see also Schneckloth v. Bustamonte,
 
 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The State bears the heavy burden of showing that consent was given voluntarily and “not mere acquiescence to police authority.”
 
 Smith,
 
 753 So.2d at 715;
 
 see also Florida v. Royer,
 
 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). To determine the voluntariness of consent, we consider the totality of the circumstances.
 
 Kutzorik v. State,
 
 891 So.2d 645, 647 (Fla. 2d DCA 2005). Three factors inform this analysis: “(1) the time and place of the encounter!,] (2) the number of [deputies] present[,] and (3) the [deputies’] words and actions.”
 
 Id.; see also Miller v. State,
 
 865 So.2d 584, 587 (Fla. 5th DCA 2004). We analyze these factors “from the perspective of a reasonable person, untrained in the law, deciding whether he or she is free to end the encounter.”
 
 Smith,
 
 753 So.2d at 716 (Altenbernd, Acting C.J., concurring).
 

 The deputies initiated the “knock and talk” encounter in the early morning hours. Although not dispositive, the lateness of the hour “add[s] to the intimidating circumstance[s]” faced by Mr. Hardin and his wife.
 
 See Kutzorik,
 
 891 So.2d at 648.
 

 
 *1249
 
 The number of deputies who descended on the motel room suggests that Ms. Sierra acquiesced to law enforcement authority.
 
 See Miller,
 
 865 So.2d at 588 (holding that the presence of three officers in uniform was a considerable show of authority sufficient to create the perception that a major criminal investigation was underway). In
 
 Kutzorik,
 
 the presence of three uniformed police officers in the defendant’s small trailer implied coercion. 891 So.2d at 648. Here, Mr. Hardin’s motel room was not very big or spacious.
 
 See Royer v. State,
 
 389 So.2d 1007, 1018 (Fla. 3d DCA 1979) (holding that being in a small enclosed area confronted by two police officers presents an almost classic definition of imprisonment),
 
 aff'd,
 
 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).
 

 When Ms. Sierra handed over the contraband, three deputies were in the room; Mr. Hardin remained outside with a K-9 officer. That two of the deputies in the room were men makes it even more likely that the naked Ms. Sierra was intimidated by the show of authority.
 
 See Malinski v. New York,
 
 324 U.S. 401, 407, 65 S.Ct. 781, 89 L.Ed. 1029 (1945) (holding that questioning defendant in a hotel room with only a blanket covering him was a tactic of humiliation and the subsequent consent invalid). As Judge Altenbernd recognized in
 
 Smith,
 
 “a polite and courteous request to search from a uniformed officer, emerging from a police car while armed with a gun and nightstick, conveys a completely different degree of authority, for instance, than a brusk order from an ice cream vendor to buy a Good Humor bar.” 753 So.2d at 717 (Altenbernd, Acting C.J., concurring).
 

 The deputies’ behavior and actions also indicate that Ms. Sierra was coerced and did not act voluntarily. Mr. Hardin gave Deputy Glasscock, a woman, consent to enter the motel room to speak to his wife. Nothing in the record reflects that he consented to two male deputies entering the room. While Deputy Baez’s presence may have been necessary as a translator, nothing supports Deputy Launikitis’ entry into the room without consent, especially after a search of the room and car turned up nothing. “Absent consent, a search warrant, or an arrest warrant, a police officer may enter a private home only when there are exigent circumstances for the entry.”
 
 Tillman v. State,
 
 934 So.2d 1263, 1272 (Fla.2006). It is a very different thing for Mr. Hardin to allow a woman deputy to enter the room to speak with his naked wife than for him to consent to the presence of two male deputies in that same room.
 
 See Alamo v. State,
 
 891 So.2d 1059, 1062-63 (Fla. 2d DCA 2004) (holding that consent given to one officer may not be substituted as consent to another officer).
 

 We cannot overlook the fact that the deputies alerted Mr. Hardin and Ms. Sierra from the outset that they were being investigated for illegal drugs. In
 
 Kut-zorik,
 
 we observed that “[t]he fact that Kutzorik knew she was the target of the investigation, and that law enforcement believed she was hiding drugs in her home, suggests a seizure rather than a consensual encounter.” 891 So.2d at 648;
 
 see also Luna-Martinez,
 
 984 So.2d at 600 (holding that when the police unequivocally assert that they “know” the suspect is hiding contraband, it may point to the conclusion that the suspect reasonably believed he would be required to allow a search);
 
 Royer,
 
 389 So.2d at 1018 (holding that officers’ informing defendant that a criminal investigation was focused on him provided a clear sign that he had in fact been taken into custody). After a fruitless search of the room, the deputies repeatedly told Ms. Sierra that they knew she had drugs and promised that she would not be charged if
 
 *1250
 
 she cooperated. “[R]epeated requests for consent may be significant in showing that the ostensible request was in reality a demand” and when “an individual is informed of the suspicions of the police in a hectoring manner ... the specter of coercion may arise.”
 
 Luna-Martinez,
 
 984 So.2d at 600-01;
 
 see also Kutzorik,
 
 891 So.2d at 648. Coercion, rather than voluntary consent, compelled Ms. Sierra to turn over the contraband.
 

 Ultimately, the deputies were right in their hunch about illegal drugs. We readily admit that law enforcement and crime detection are critical to an ordered society. We recognize and appreciate the difficult tasks that law enforcement officers undertake. Yet, we must do justice to the Fourth Amendment. As Justice Holmes cautioned more than eighty years ago, the delicate balance between crime detection and Fourth Amendment liberty necessarily requires that “some criminals should escape [rather] than that the government should play an ignoble part.”
 
 Olmstead v. United States,
 
 277 U.S. 488, 470, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (Holmes, J., separate opinion).
 
 [7]
 

 The deputies sprang into action on the supposition that anyone from Brownsville must be engaged in illegal activity. While not directly related to the question of consent, this supposition merits discussion. We cannot conclude that it is reasonable to suspect criminal behavior based solely on an individual’s origin.
 
 See Royer,
 
 389 So.2d at 1016 (“The fallacy of the undistributed middle directly applies: all narcotics couriers act like parts of the profile, but most people who act like parts of the profile are not narcotics couriers.”). So, too, the discrepancy between the names on the car and motel registrations was an unreasonable basis to believe that drug activity was afoot. “[0]ne’s use in this manner of a name which is not his own, while perhaps suspicious, is not unlawful and certainly does not give rise to a reasonable belief that he is in the process of committing a felony.”
 
 Royer,
 
 389 So.2d at 1019 n. 11. The initial “knock and talk” was lawful. But, continuing the encounter in the intimidating manner suggested by the record for at least an hour, and after two fruitless searches, exceeded the bounds of consent.
 
 See Popple v. State,
 
 626 So.2d 185, 186 (Fla.1993);
 
 see also Dunaway v. New York,
 
 442 U.S. 200, 218-19, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979) (holding that detention for over an hour without probable cause violates the Fourth Amendment);
 
 Pierce v. Multnomah County,
 
 76
 
 F.Sd
 
 1032, 1038 (9th Cir.1996) (holding that “[t]he length and scope of [a] detention must be justified by the circumstances authorizing its initiation”).
 

 Considering the totality of the circumstances reflected in the record before us, we hold that Ms. Sierra did not voluntarily consent to hand over contraband to the officers.
 
 See Kutzorik,
 
 891 So.2d at 648. The trial court should have granted Mr. Hardin’s motion to suppress.
 

 Reversed.
 

 WALLACE and KHOUZAM, JJ., Concur.
 

 [1]
 

 . We need not address Mr. Hardin's corpus delicti argument.
 

 [2]
 

 . The law enforcement officers in this matter held various ranks. For convenience, we will refer to them as deputies.
 

 [3]
 

 .Ms. Sierra's full name is Juana Pesina-Sier-ra. The motel registration included a copy of her driver’s license with the name Juana Sierra, and the signature on the registration was Juana Pesina. The car was registered to Maria Pesina Guzman, Ms. Sierra's sister.
 

 [4]
 

 . Apparently, Ms. Sierra had no earlier opportunity to dress.
 

 [5]
 

 . There is no consistent testimony about the time of diese events. We can say that the entire encounter, from the lime the deputies knocked on the motel room door to the time of Mr. Hardin's arrest, lasted at least an hour sometime between 2:30 a.m. and 4 a.m.
 

 [6]
 

 . On appeal, the State does not contest Mr. Hardin's standing to challenge the seizure.
 
 See Elson v. State,
 
 337 So.2d 959, 962-63 (Fla.1976) (holding that the defendant had standing to assert the constitutional right to be free from unreasonable search of a motel room registered in another’s name where the defendant had a motel room key and the room contained the defendant’s property).
 

 [7]
 

 . The Supreme Court subsequently overruled
 
 Olmstead's
 
 holding that obtaining of evidence by wiretapping, in violation of state law, did not affect its admissibility.
 
 See Katz v. United States,
 
 389 U.S. 347, 354, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967);
 
 Berger v. New York,
 
 388 U.S. 41, 50-51, 64, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967).