# Third District Court of Appeal

## State of Florida

Opinion filed September 10, 2014.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D13-1796
Lower Tribunal No. 12-3833
_____

**The State of Florida,**
Appellant,

vs.

**Alberto Hernandez,**
Appellee.

An Appeal from the Circuit Court for Miami-Dade County, Ellen Sue Venzer, Judge.

Pamela Jo Bondi, Attorney General, and Michael W. Mervine, Assistant Attorney General, for appellant.

Carlos J. Martinez, Public Defender, and Howard K. Blumberg, Special Assistant Public Defender, and Hermis D. Sanchez and Magali J. Sanders, Certified Legal Interns, for appellee.

Before ROTHENBERG, SALTER, and LOGUE, JJ.

ROTHENBERG, J.

The defendant, Alberto Hernandez, was charged with trafficking in cannabis and possession of a place for the purpose of trafficking based on the seizure of a large quantity of marijuana the defendant was cultivating inside his home. After conducting an evidentiary hearing, and unfortunately in reliance on an incorrect representation of the law by defense counsel, the trial court suppressed the defendant's statements and the physical evidence. We reverse.

The evidence is as follows. Five officers from the Miami-Dade Police Narcotics Bureau responded to the defendant's residence in two unmarked police vehicles at 4:25 p.m. to investigate an anonymous tip that marijuana was being cultivated inside the residence. The officers were dressed in plain clothes and black tactical police vests. When they arrived, the defendant and Orlando Garcia ("Garcia") were smoking cigarettes in the front yard of the residence while leaning against a chain-link fence that separated the defendant's yard from public property.

Only Detectives David Quintas and Luis Correa (collectively "the detectives") approached the defendant, and no weapons were drawn at any point during the encounter. As soon as the detectives approached the defendant, they identified themselves and produced their police identifications. After the detectives identified themselves, the defendant told the detectives that he was the owner of the property, opened the gate to invite the detectives onto his property, and asked the detectives, "What's going on?" However, because the detectives

2

saw two or three dogs roaming unsecured in the yard (and one of the dogs was a large dog), they did not want to enter the yard. Detective Correa explained to the defendant that they did not want to enter the property because of the dogs, and Detective Correa asked the defendant if the defendant would step out onto the sidewalk instead to speak with the detectives.

When the defendant exited his property, the detectives asked him for identification to verify who they were speaking to and to place the defendant's name in their report. After the defendant produced his identification, the detectives told the defendant that they had received a tip that marijuana was being grown at that location and handed the defendant a consent to search form. The defendant read the form out loud. The consent to search form specifically informed the defendant that he had the right to refuse to give the detectives consent to search and that he could demand that a search warrant be obtained before a search was conducted. Despite being informed of these rights, the defendant signed the form consenting to the search, walked Detectives Correa and Quintas to the back of the house, allowed them to enter the house, and escorted them to a marijuana lab within the house. The detectives advised the defendant of his rights per a written rights waiver form, and after the defendant read and signed the form, the defendant provided a written confession.

3

The State and the defense agree that the officers had no probable cause or reasonable suspicion when they responded to the defendant's home and that their investigation began as a police encounter similar to a "knock and talk." The issues in this appeal are whether the encounter evolved into a seizure implicating the Fourth Amendment and whether the defendant's consent was voluntary, or rather, as a result of coercion.

A search based on consent is lawful if the consent was given freely and voluntarily. Jorgenson v. State, 714 So. 2d 423, 426 (Fla. 1998). The determination of whether a seizure has occurred and whether the consent was given freely and voluntarily must be based on the totality of the circumstances. State v. Baez, 894 So. 2d 115, 117 (Fla. 2004) ("[T]he totality of the circumstances controls in cases involving the Fourth Amendment."); Reynolds v. State, 592 So. 2d 1082, 1086     (Fla. 1992); Luna-Martinez v. State, 984 So. 2d 592, 597 (Fla. 2d DCA 2008). The factors to consider when analyzing the totality of the circumstances include: (1) the time and place of the encounter; (2) the number of officers present; (3) the officers' words and actions; (4) the age and maturity of the defendant; (5) the defendant's prior contacts with the police; (6) whether the defendant executed a written consent form; (7) whether the defendant was informed that he could refuse to give consent; and (8) the length of time the

defendant was interrogated before consent was given. See generally Luna-Martinez, 984 So. 2d at 597-602 (discussing each of these factors).

Rather than addressing these factors and challenging the consensual nature of the encounter based on the totality of the circumstances, defense counsel argued that the defendant's consent was involuntary as a matter of law because Detective Correa obtained the defendant's identification and still had the defendant's identification in his possession when he sought the defendant's consent. In support of this argument, defense counsel told the trial court that the law was clear on this issue and that suppression was required based on Perko v. State, 874 So. 2d 666 (Fla. 4th DCA 2006), Brye v. State, 927 So. 2d 78 (Fla. 1st DCA 2006), and State v. Campbell, 911 So. 2d 192 (Fla. 4th DCA 2005), which defense counsel provided to the trial court. The trial court ultimately relied on these cases in suppressing the evidence.

Unfortunately, neither the defense nor the State informed or provided the trial court with Golphin v. State, 945 So. 2d 1174 (Fla. 2006), wherein the Florida Supreme Court disagreed with the Fourth District Court of Appeal's analysis in Perko and Baez v. State, 814 So. 2d 1149 (Fla. 4th DCA 2002), which was substantially the same analysis as the Fourth District Court of Appeal's analysis in Campbell and the First District Court of Appeal's analysis in Brye. Defense counsel, therefore, led the trial court to error.

5

Had the trial court been provided with Golphin, it would have learned that the Fifth District Court of Appeal in Golphin v. State, 838 So. 2d 705 (Fla. 5th DCA 2003), had certified conflict with Baez v. State, 814 So. 2d 1149 (Fla. 4th DCA 2002) ("Baez I"), regarding this very issue. In Baez I, the Fourth District Court of Appeal created a bright line rule that police officers necessarily effect a seizure when they hold a suspect's identification during questioning after an initial check of the identification. Id. at 1151-52. Conversely, in Golphin, the Fifth District Court of Appeal found a similar scenario subject to the usual totality of the circumstances analysis. Golphin, 838 So. 2d at 707-08. In resolving the conflict, the Florida Supreme Court in Golphin noted that another panel at the Fourth District Court of Appeal had performed the same analysis and reached the same conclusion as the Baez I court in Perko, finding that Perko was effectively seized when the police retained his identification and obtained Perko's consent to search, which yielded drug evidence; whereas the Second District Court of Appeal had reached the opposite conclusion in Mays v. State, 887 So. 2d 402 (Fla. 2d DCA 2004), Watts v. State, 788 So. 2d 1040 (Fla. 2d DCA 2001) (en banc), State v. Mitchell, 638 So. 2d 1015 (Fla. 2d DCA 1994), and McLane v. Rose, 537 So. 2d 652 (Fla. 2d DCA 1989). Golphin, 945 So. 2d at 1178.

The Fourth District's decision in Campbell simply followed Perko, and the First District aligned itself with the Fourth District in Brye. Thus, the conflict the

6

Florida Supreme Court was in effect resolving was the Fourth and First District's positions in Baez, Perko, Campbell, and Brye (concluding that the defendant in each case was seized when the police retained his identification and thus the consent given was not voluntary), and the Second and Fifth District's contrary conclusions in Golphin, Mays, Watts, Mitchell, and McLane (applying a totality of the circumstances analysis).

Ultimately, the Florida Supreme Court approved the Fifth District's reasoning in Golphin and concluded that whether a person has been seized for purposes of the Fourth Amendment is based on the totality of the circumstances— not a bright line rule. Golphin, 945 So. 2d at 1174. Importantly, the Florida Supreme Court also found that a noncompulsory request for identification will generally not in itself implicate the Fourth Amendment. Id. at 1185. However, further investigation or a search after an officer has taken a suspect's license is a factor to be considered when determining whether a seizure has occurred. Id. at 1185. By way of example, the Florida Supreme Court compared the circumstances in Florida v. Royer, 460 U.S. 491 (1983), to those in United State v. Mendenhall, 446 U.S. 544 (1980).

In both Royer and Mendenhall, narcotics agents approached people who were traveling through major airports and who fit the drug courier profile. In both cases, the agents requested that the traveler produce his travel documents and

7

identification. After producing the travel documents and identification, the traveler consented to a search, and the search revealed that the traveler was carrying illicit drugs. Golphin, 945 So. 2d at 1185. The United States Supreme Court concluded that although Royer was seized for Fourth Amendment purposes, Mendenhall was not. Id. Importantly, the United States Supreme Court found that what distinguished Mendenhall from Royer was that Royer's ticket and identification remained in the possession of the officers throughout the encounter, the officers had possession of Royer's luggage, and as a practical matter, Royer could not leave the airport without them. In contrast, in Mendenhall, no luggage was involved; Mendenhall's ticket and identification were immediately returned; and the officers were careful to advise Mendenhall that he could decline to be searched. Golphin, 945 So. 2d at 1185.

The Florida Supreme Court additionally noted that some courts have also considered whether the retention of the individual's papers would likely have impeded his freedom to go about his business as a factor in the totality of the circumstances analysis. Id. at 1187. Thus, these courts have taken into consideration the status of the individual (for example: whether he was the driver or passenger of a vehicle or a pedestrian), the type of identification involved, and the individual's immediate business. Id. at 1186-87. For example, the Florida Supreme Court noted that in United States v. Analla, 975 F. 2d 119 (4th Cir. 1992),

8

the police received a call that a man using a pay phone matched the description of a man wanted in connection to a robbery. Golphin, 945 So. 2d at 1187. Two officers responded to the pay phone, approached the man, asked to speak with him, requested the man's driver's license and registration, and requested an outstanding warrants check via walkie-talkie while another officer asked the man for permission to search his car. The man, Analla, consented, and the officers found the murder weapon in his car. The Fourth Circuit Court of Appeals found that Analla was not seized because the officer necessarily had to retain Analla's identification and registration for a short time to perform a warrants check; the officer did not take the license into his squad car, but instead stood beside the car near Analla and used his walkie-talkie to run the warrants check; and Analla was free to request that his documents be returned to him and to leave the scene. Id.

In examining the facts in Golphin, the Florida Supreme Court noted that the officers approached the group of men in a casual manner without the use of sirens, lights, or weapons and without blocking the egress of the area. Golphin interacted primarily with a single officer; and the officer engaged Golphin in a casual manner, requested Golphin's identification, which Golphin voluntarily provided, and conducted the warrants check in Golphin's presence. Additionally, Golphin was not summoned to be questioned in the presence of multiple officers, isolated in any way, or treated in a way that would suggest that he was not free to go.

9

Golphin, 945 So. 2d at 1188. He also "was not the driver of a vehicle such that abandoning his driver's license identification to the officer's possession would subject him to penalty for violating Florida's traffic laws." Id. Thus, the Florida Supreme Court found that "theoretically, retention of Golphin's identification would not have constrained his ability to either request the return of the identification or simply end the encounter by walking into the apartment in which he was staying." Id. Based on the totality of the circumstances, the Florida Supreme Court found that Golphin's encounter with the police was consensual and that the "consensual encounter did not mature into a seizure simply because the police retained Golphin's identification." Id. at 1193.

## The Instant Case

An examination of all the factors relevant to a totality of the circumstances analysis in this case shows that, much like the stop in Golphin, Hernandez's encounter with the police was consensual.

### A. **Time**

The encounter occurred at 4:25 in the afternoon.

### B. **Location of the encounter**

The detectives were standing on a public sidewalk when they initiated their "knock and talk." The detectives did not enter the defendant's property without his consent. In fact, after the detectives identified themselves, the defendant, absent a

request from the detectives, opened the gate to invite the officers onto his property. However, because of the dogs, the detectives declined the defendant's invitation and asked the defendant if he would come out onto the sidewalk instead. All of these actions were voluntary.

## C. **The defendant's age and maturity**

The defendant was fifty-four years old.

## D. **Number of officers**

Although five officers were present, only two approached the defendant, and Detective Correa individually conducted the "knock and talk" with Detective Quintas serving as a witness. Thus, the defendant's interaction with law enforcement was essentially with one officer. All of the officers were dressed in plain clothes but wearing tactical vests. No guns were drawn, and the officers arrived in two unmarked vehicles.

## E. **The words and actions of the police**

The officers approached in a casual manner, identified themselves, produced their identification for the defendant's review, and explained why they were there. They asked to see the defendant's identification to confirm the defendant's identity. Although Detective Correa still had the defendant's identification in his possession when he presented the defendant with a consent to search form, the entire encounter at that point was very brief—"only minutes"—no interrogation

had been conducted, and the officers remained on public property and did not enter onto the defendant's property even after the defendant invited them to enter.

F. **Consent form**

The defendant was presented with a written consent to search form, which the defendant read out loud. This form specifically advised the defendant that he had the right to refuse to give consent and to require the officers to obtain a warrant before conducting a search. And, based on the trial courts factual findings, the defendant signed the consent to search form without the officers making any threats. G. **The defendant's ability to terminate the encounter**

The defendant was at his own home, not in a car, at an airport, or any other public place. He was outside his own gated property, and the police had already declined the defendant's invitation to enter the property. The defendant could have simply requested the return of his identification, refused to answer any further questions, and gone back onto his own property inside the gate or into his home. Instead, the defendant signed a consent to search form, locked up his dogs so the police could enter, and escorted the officers to the room where he was cultivating his marijuana. The defendant then executed a Miranda[1] rights waiver form in which he agreed that he was speaking freely and voluntarily with the police without counsel.

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

## Conclusion

Under the totality of the circumstances, and based on the Florida Supreme Court's reasoning in Golphin, the defendant's encounter with the police was consensual, and the consensual encounter did not evolve into a seizure simply because the officers had not yet written down the defendant's information and still had his identification in their possession when they presented the defendant with a consent to search form. The trial court, which was not properly informed regarding the law and did not have the benefit of Golphin, which essentially disagreed with the case law provided by defense counsel, was unfortunately led into error. Accordingly, we reverse the order suppressing the evidence and the defendant's statements and remand for further proceedings.

Reversed and remanded.